766 So.2d 1010 (2000)
Robert MURPHY and Technology Innovations International, Inc., Petitioners,
v.
INTERNATIONAL ROBOTIC SYSTEMS, INC., and Howard Hornsby, Respondents.
No. SC92837.
Supreme Court of Florida.
August 17, 2000.
*1012 R. Stuart Huff and Mark L. Mallios, Coral Gables, Florida, for Petitioners.
David A. Jaynes, West Palm Beach, Florida, for Respondents.
LEWIS, J.
We have for review Murphy v. International Robotics Systems, Inc., 710 So.2d 587 (Fla. 4th DCA 1998), which expressly and directly conflicts with decisions from the First and Third District Courts of Appeal[1] regarding when relief may be granted in a civil case based upon improper, but unobjected-to, closing argument. We have jurisdiction. See Art. V, § 3(b)(3), Fla. Const. As explained more fully below, we hold that relief may not be granted in a civil case[2] based on improper, *1013 but unobjected-to, closing argument unless such argument is first challenged and judicially evaluated in the trial court.

I. GENERAL FACTUAL BACKGROUND IN THE PRESENT CASE
During the mid-1980s, Robert Murphy (Murphy) and Howard Hornsby (Hornsby) developed a low-profile, remote-controlled, unmanned marine vehicle known as the OWL. Generally described, the OWL consists of a fiberglass hull, motor, and various electronic components, all formed around the base of a jet ski type personal watercraft. In 1988, Murphy and Hornsby, along with several other individuals, formed International Robotic Systems, Inc. (Robotic Systems I), a Florida corporation, in large part to conduct business relating to the development and marketing of the OWL. Murphy and Hornsby each owned forty percent of the stock in Robotic Systems I; Murphy became the president of the company and Hornsby its vice-president. By 1990, two patents had been issued to Murphy and Hornsby as co-inventors of the OWL, and they assigned those patents to Robotic Systems I.
During the late 1980s and early 1990s, Murphy and Hornsby attempted to attract business interest in the OWL, with a primary potential customer being the U.S. Navy. In addition to the U.S. Navy, private companies such as Boston Whaler and Israeli Aircraft Industries expressed varying interest in the product. Also during this time period, several business interests loaned funds to Robotic Systems I, including a New York financier who loaned $100,000 to the company, and International Commercial Development Company (ICDC), which loaned the company $125,000. To secure the $125,000 loan from ICDC, Robotic Systems I assigned the two patents on the OWL to ICDC as collateral. Robotic Systems I also obtained several other smaller loans during this time period.
By the end of 1991, the U.S. Navy had expressed an interest in purchasing a prototype OWL, but there were no guarantees of when, if ever, the Navy would actually make the purchase. During February 1992, Murphy and Hornsby were introduced to John Terry Carroll (Carroll), an employee and representative of United Technologies Optical Systems (UTOS), a subsidiary of United Technologies Corporation (UTC). UTOS was not UTC's only subsidiary, as UTC was also the parent company of entities such as Pratt-Whitney; generally speaking, UTC was a large corporate entity with significant ties to the defense industry. Upon meeting with Murphy and Hornsby and viewing the OWL, Carroll expressed interest in the OWL's potential uses.
In April 1992, Carroll introduced Murphy and Hornsby to Peter Just (Just) and John Wood (Wood), officers of Laser Holdings, Ltd. (Laser), an Australian company with which UTC had a pre-existing business relationship. On April 12, 1992, Murphy, Hornsby, Just, and Wood met to discuss the sale of Robotic Systems I's assets to Laser. Carroll attended this meeting as well, acting in large part as moderator. At the end of the meeting, Murphy and Hornsby on behalf of Robotic Systems I, and Just and Wood on behalf of Laser, executed a "Memorandum of Understanding" (MOU). According to the terms of the MOU, Robotic Systems I agreed to sell its assets to Laser for $200,000, of which $25,000 would be payable on April 15, 1992, with the remaining $175,000 payable at closing. The assets to be transferred included, among other things, the two OWL patents, any future contract with the U.S. Navy, a prototype OWL, and the goodwill of Robotic Systems I, including its corporate name. The memorandum also specified that any sale was contingent upon (1) Robotic Systems I successfully procuring a contract from the U.S. Navy for the purchase of an OWL; and (2) Hornsby becoming an employee of the purchasing company.
After executing the MOU, but prior to closing, the parties entered into several additional agreements. Specifically, on *1014 May 27, 1992, Laser entered into a "Consultancy Agreement" and a "Loan Agreement" with Robotics Systems I, and Laser also entered into a "Commission Agreement" with Hornsby and Murphy, individually. Under the terms of the "Consultancy Agreement," Robotic Systems I agreed to be a consultant to Laser for a period of five years for development of the business purchased from Robotic Systems I, and Laser agreed to pay a total consultant's fee of not less than $300,000 but not more than $400,000 during that five-year period. According to the "Loan Agreement," Laser agreed to lend $300,000 to Robotic Systems I for a five-year period at an interest rate of six percent, to be paid back in amounts to be agreed upon by the parties "from time to time." Finally, under the terms of the "Commission Agreement," Laser agreed to pay Murphy and Hornsby a commission of $5000 each for every OWL produced in the first twelve months following the date of execution of the agreement, and $750 for every OWL produced in the four years following that first twelve-month period. The cap on commissions payable to Murphy and Hornsby over the five-year period was $1,000,000 each.
The closing on the proposed transaction was held on July 24, 1992. Several weeks prior to that time, one of the conditions precedent to the proposed transaction had been fulfilled; namely, the U.S. Navy entered into a contract with Robotic Systems I for the purchase of a prototype OWL, with a sales price of approximately $449,000. Hornsby fulfilled the other condition precedent set forth in the MOU by agreeing at the closing to a five-year employment contract with the Australian interests, with a starting salary of $80,000 per year. In conjunction with the closing, Just and Wood formed a new Florida corporation, Justwood, Inc. (Justwood), to receive the assets of Robotic Systems I, including its corporate name. Additionally, all of Laser's rights under the previously executed agreements were transferred to Justwood, which adopted the name International Robotic Systems, Inc. (Robotic Systems II). At the same time, Robotic Systems I changed its name to Technology Innovations International, Inc. (Innovations), and Murphy remained with Innovations. Using the money obtained from the sale, Robotic Systems I satisfied all of its existing debts.
After the closing, Hornsby, as president of Robotic Systems II, began developing and building a new prototype OWL according to the specifications and requirements set forth in the contract with the U.S. Navy. Cost overruns occurred during this development and building process, and the OWL ultimately was delivered to the U.S. Navy behind schedule. During the same time period, Laser experienced financial difficulties and was placed into receivership in Australia. A $5000 commission check was sent to Murphy for the OWL produced for the U.S. Navy, and another $750 commission check was sent to him after another prototype demonstrator OWL was produced. The OWL built for the Navy and the demonstrator OWL were the only two OWLs fully produced in the three years following the closing of July 14, 1992.

II. PROCEEDINGS IN THE TRIAL COURT AND THE FOURTH DISTRICT
Murphy and Innovations (collectively "the Plaintiffs") filed suit against UTC/UTOS, Laser, Robotic Systems II, and Hornsby (collectively "the Defendants"). One of the Plaintiffs' primary allegations was that Carroll, the employee and representative of UTOS/UTC, had misrepresented the extent of involvement that UTC/UTOS would have in producing and marketing the OWL after the deal with Laser was completed. More specifically, the Plaintiffs asserted that Carroll represented that the Australian interests were merely a conduit for UTC/UTOS to become involved with the OWL. The Plaintiffs claimed that if the major corporate presence of UTC/UTOS had supported the OWL, the ultimate financial and production *1015 problems associated with the product would not have occurred.
The case proceeded to trial and, at the conclusion of the four-week trial, the jury found in favor of the Defendants[3] on all but one claim. Specifically, the jury returned a special interrogatory verdict form finding the following: (1) none of the Defendants either intentionally or negligently misrepresented material facts which the Plaintiffs reasonably relied upon and which caused monetary losses to the Plaintiffs; (2) none of the Defendants conspired with one another to intentionally misrepresent material facts which the Plaintiffs relied upon and which caused monetary losses to the Plaintiffs; (3) none of the Defendants breached the "Commission Agreement" with Murphy; (4) none of the Defendants breached the "Consultancy Agreement" with Innovations;[4] (5) Hornsby, individually, breached a fiduciary duty owed to the Plaintiffs, from which the Plaintiffs suffered damages in the amount of $1; (6) Hornsby, individually, did not receive and conceal moneys for himself which were corporate opportunities of Innovations;[5] (7) the assignment of the two OWL patents from Innovations to Robotic Systems II should not be held null and void due to the conduct of the Defendants; and (8) none of the Defendants were liable for punitive damages.
After the jury returned its verdict and the trial court had discharged the jury, the Plaintiffs filed a motion for new trial, seeking relief on several grounds. First, the Plaintiffs alleged that a special "reasonable reliance" jury instruction given by the trial court at the request of the Defendants erroneously stated the law and thus required a new trial. Second, the Plaintiffs argued that they were entitled to a new trial against the Defendants because counsel for UTC/UTOS[6] allegedly made numerous improper comments during closing argument, even though counsel for the Plaintiffs made no objections during such argument. Finally, the Plaintiffs alleged that the jury verdict was against the manifest weight of the evidence and was grossly inadequate as to the award of damages against Hornsby. After considering the parties' memoranda of law and conducting a hearing, the trial court entered an order summarily denying the Plaintiffs' motion for new trial, and the Plaintiffs appealed.[7]
On appeal, the Fourth District rejected the Plaintiffs' request for relief on the closing argument issue.[8]See Murphy, 710 So.2d at 587-91. In so doing, the court (1) disagreed with decisions from the First, *1016 Third, and Fifth Districts[9] as to when relief may be granted in a civil case based upon improper, but unobjected-to, closing argument, see id. at 587-88; (2) stated that "we do not think improper, but unobjected-to, closing argument in a civil case is something which is so fundamental that there should be an exception to the rule requiring an objection," id. at 589; and (3) expressed that it did not think it was being inconsistent with precedent from this Court on the improper, but unobjected-to, closing argument issue. See id. at 590. The Plaintiffs petitioned this Court for review, and we granted review to resolve the conflict among Florida's District Courts of Appeal regarding the improper, but unobjected-to, closing argument issue.[10] Thus, it is within these complex and multiple contractual circumstances that required four weeks of trial for presentation to a jury that we consider the unobjected-to closing argument issue.

III. ANALYSIS OF THE CONFLICT ISSUE

A. GENERAL BACKGROUND
This Court has previously decided four civil cases involving the issue of improper, but unobjected-to, closing argument. See White Constr. Co. v. Dupont, 455 So.2d 1026 (Fla.1984); Tyus v. Apalachicola N. R.R. Co., 130 So.2d 580 (Fla.1961); Seaboard Air Line R.R. Co. v. Strickland, 88 So.2d 519 (Fla.1956); Baggett v. Davis, 124 Fla. 701, 169 So. 372 (1936). As explained in more detail below, this Court recognized in those cases that, under certain circumstances, a civil litigant may obtain relief based on improper closing argument made by counsel for an opposing party, even though the litigant's own counsel failed to contemporaneously object to such improper argument. See Dupont, 455 So.2d at 1030; Tyus, 130 So.2d at 587-88; Strickland, 88 So.2d at 523-24; Baggett, 124 Fla. at 717, 169 So. at 379. Stated another way, this Court recognized an exception to the contemporaneous objection requirement in civil cases in the context of improper, but unobjected-to, closing argument. However, despite this Court's prior decisions, there has been much recent debate regarding (1) whether an exception to the contemporaneous objection requirement should continue to exist in civil cases in this context; and (2) if such an exception continues to exist, what the appropriate standard for relief should be. This case affords the opportunity to address both the continuing validity of the exception and the appropriate standard for determining whether relief should be granted.

B. CONTINUING VALIDITY OF THE EXCEPTION
The contemporaneous objection requirement originated in the English legal system as a mechanism for preserving error for appellate review, and the requirement was carried forward and generally adopted in America. See, e.g., Robert J. Martineau, Considering New Issues On Appeal: The General Rule and the Gorilla Rule, 40 Vand. L.Rev. 1023, 1026 (1987). In Florida, "[j]ust like with any other trial error, lawyers have a duty to object to improper comments made during closing arguments." Fravel v. Haughey, 727 So.2d 1033, 1034 (Fla. 5th DCA 1999) (en banc). In Pfeifer v. Jones & Laughlin Steel Corp., 678 F.2d 453, 457 n. 1 (3d Cir.1982), vacated on other grounds, 462 U.S. 523, 103 S.Ct. 2541, 76 L.Ed.2d 768 (1983), the United States Court of Appeals for the *1017 Third Circuit stated that the reasons for the contemporaneous objection requirement:
go to the heart of the common law tradition and the adversary system. It affords an opportunity for correction and avoidance in the trial court in various ways: it gives the adversary the opportunity either to avoid the challenged action or to present a reasoned defense of the trial court's action; and it provides the trial court with the alternative of altering or modifying a decision or of ordering a more fully developed record for review.
In Castor v. State, 365 So.2d 701, 703 (Fla.1978), this Court similarly stated:
The requirement of a contemporaneous objection is based on practical necessity and basic fairness in the operation of a judicial system. It places the trial judge on notice that error may have been committed, and provides him an opportunity to correct it at an early stage of the proceedings. Delay and an unnecessary use of the appellate process result from a failure to cure early that which must be cured eventually.
While it is clear that this Court has previously recognized an exception to the contemporaneous objection requirement in civil cases in the context of improper, but unobjected-to, closing argument, there has been much recent debate regarding whether such an exception should continue to exist. For example, the Fourth District stated in Murphy that "we do not think improper, but unobjected-to, closing argument in a civil case is something which is so fundamental that there should be an exception to the rule requiring an objection." 710 So.2d at 589. Similarly, in Walt Disney World Co. v. Blalock, 640 So.2d 1156, 1159 (Fla. 5th DCA 1994) (Griffin, J., concurring in part and dissenting in part), Judge Griffin commented: "I have come to be of the view that a party who does not object to counsel's comments in closing should not be allowed to complain of those comments on appeal." Finally, in a recently published law review article, the author of the opinion below, Judge Klein, concluded that there should no longer be an exception to the contemporaneous objection requirement in civil cases in the context of improper, but unobjected-to, closing argument. See Larry A. Klein, Allowing Improper Argument of Counsel to be Raised for the First Time on Appeal as Fundamental Error: Are Florida Courts Throwing Out the Baby with the Bath Water?, 26 Fla. St. U.L.Rev. 97, 98-126 (1998) [hereinafter Klein, Baby with the Bath Water]; see also Gary D. Fox, Objectionable Closing Argument: Causes and Solutions, 70 Fla. B.J. 43, 48 (Dec. 1996) (proposing abolition of "the part of the fundamental error rule that allows a party to preserve error without objecting to its adversaries' closing argument"). In determining whether we should continue recognizing an exception to the contemporaneous objection requirement in civil cases in this context, we consider this Court's prior decisions addressing the issue, how courts in other jurisdictions have addressed the issue, and the competing policy concerns that must be considered.

1. THIS COURT'S PRIOR DECISIONS
The first of this Court's decisions in the civil context addressing improper, but unobjected-to, closing argument was Baggett, in which the plaintiff sought recovery for injuries sustained in an automobile accident. See 124 Fla. at 704, 169 So. at 374. The jury found in favor of the plaintiff, and the defendant filed a motion for new trial; the trial court denied that motion, and the case proceeded for review in this Court. See id. at 706, 169 So. at 375.
Before this Court, the defendant asserted that numerous errors had occurred during trial, many of which related to the jury instructions given by the trial court, see id. at 709-13, 169 So. at 376-78, two of which related to the admission of evidence, see id. at 706-10, 169 So. at 375-76, and two of which related to several statements made *1018 by plaintiff's counsel during closing argument.[11]See id. at 715-16, 169 So. at 378-79. After addressing the admission of evidence and jury instruction issues and finding two errors therein, see id. at 709-15, 169 So. at 376-78, this Court considered the statements made by plaintiff's counsel during closing argument. See id. at 714-17, 169 So. at 378-79.
The bill of exceptions filed by the defendant showed that the first allegedly improper statement made by plaintiff's counsel consisted of the following:
Gentlemen of the Jury, in considering the amount of your verdict you need not stop to consider that it will cost Mr. Baggett, the defendant, because he will not be out anything, and that same will not cost him a cent, and that he will not be one cent richer or poorer; or words to that effect.
Id. The Baggett Court noted that the defendant did not object to this statement, nor had the trial court "of its own motion" admonished plaintiff's counsel or instructed the jury not to consider the statement. See id. at 715, 169 So. at 378. The defendant's bill of exceptions also set forth the nature of plaintiff's counsel's second allegedly improper statement:
That the defendant if a verdict was found against him had a right to file a motion for a new trial, and upon the hearing of which the trial judge would determine whether the verdict should stand or fall, and that thereafter if the trial judge held that the verdict should stand the defendant had available the right of appeal by writ of error to the Supreme Court of Florida where the legal errors in the proceedings might be reconsidered and readjudged, and that thereafter it would be necessary for the plaintiff to sue out an execution; or words to that effect.
Id. at 716, 169 So. at 378. The Baggett Court noted that defense counsel objected to this second statement and that the trial court "immediately stopped counsel for plaintiff and stated to the jury that this statement should not be considered." Id.
In analyzing the second, objected-to statement, this Court determined that the statement was improper but that the trial court corrected any error by immediately cautioning the jury to disregard the statement. See id. In analyzing the unobjected-to statement, the Baggett Court first reiterated that a party should state the grounds for objection to improper argument. See id. The Court then quoted from its prior decision in the criminal case of Akin v. State, 86 Fla. 564, 572-73, 98 So. 609, 612 (1923), in which the Court stated:
The law seems to be well settled that it is the duty of the trial judge, whether requested or not, to check improper remarks of counsel to the jury, and to seek by proper instructions to the jury to remove any prejudicial effect they may be calculated to have against the opposite party. A verdict will not be set aside by an appellate court because of such remarks or because of any omission of the judge to perform his duty in the matter, unless objection be made at the time of their utterance. This rule is subject to the exception that, if the improper remarks are of such a character that neither rebuke nor retraction may entirely destroy their sinister influence, in which event a new trial should be awarded regardless of the want of objection or exception.
*1019 See, Baggett, 124 Fla. at 716-17, 169 So. at 379. The Baggett Court found that the unobjected-to statement made by plaintiff's counsel during closing argument "was similar in its probable effect upon the jury to the first remark of counsel objected to in ... Akin v. State," and then, after addressing several other issues, reversed the trial court's judgment "for the errors pointed out herein." Id. at 717-18, 169 So. at 379. On the face of the Baggett opinion, however, it is not absolutely clear whether the unobjected-to statement made by plaintiff's counsel during closing argument was among the multiple "errors" for which this Court reversed due to the reliance upon Akin. To understand the principles, therefore, we must look to Akin for guidance.
In Akin, the defendant appealed to this Court after being convicted of forgery, arguing that numerous errors had occurred during his trial. See 86 Fla. at 566-72, 98 So. at 610-12. After agreeing with the defendant that numerous errors occurred concerning the admission and exclusion of certain evidence, see id., the Akin Court addressed the propriety of various statements made by the prosecutor during closing argument, an issue that the defendant had raised in a motion for new trial.[12]See id. at 572-73, 98 So. at 612. The first statement made by the prosecutor during closing argument in Akin, to which the Baggett Court analogized the unobjected-to statement made by plaintiff's counsel in that case, consisted of the following:
(1) "This defendant has other indictments pending against him in connection with these transactions. I do not intend to try the other cases, and it is up to you as to whether you will let this man go scot free and say that he has not committed any wrong. If he is convicted he would probably only have to pay a small fine, and it is in the power of the court to fine him not more than 5 cents, if he wanted to."
Akin, 86 Fla. at 571, 98 So. at 612. The defendant also challenged three other statements made by the prosecutor during closing argument. See id. In analyzing all of the statements made by the prosecutor, the Akin Court used the language quoted in Baggett: in short, that a timely objection to improper closing argument is required before a new trial may be granted based on such argument unless "the improper remarks are of such character that neither rebuke nor retraction may entirely destroy their sinister influence." Akin, 86 Fla. at 572-73, 98 So. at 612. The Akin Court determined that the prosecutor's first statement during closing argument was both a misstatement of the law and had no basis in the record, and that the other statements made by the prosecutor were also improper. See id. at 572, 98 So. at 612. However, the Akin Court stated the following regarding all of the prosecutor's statements:
In the case at bar no attempt seems to have been made to check the improper remarks of the state attorney by the trial court, and they were not properly excepted to by the defendant, nor does it fully appear that they came within the exception to the rule as above announced. It is proper to state, however, in addition to what has already been said in this connection, that these remarks have no basis in the record, should never be indulged in trial courts, and would ordinarily be ground for reversal.

Id. at 573, 98 So. at 612 (emphasis added). The Akin Court reversed and remanded for a new trial, see id. at 574, 98 So. at 613, but, based on the language quoted and emphasized above, it is clear that the Court did not reverse based on the prosecutor's improper statements during closing argument. Concomitantly, by analogizing the unobjected-to improper statement made by plaintiff's counsel in Baggett with the prosecutor's first statement in Akin, it appears that the Baggett Court may not *1020 have counted plaintiff's counsel's improper, but unobjected-to, statement among the errors for which it reversed.[13]
Twenty years after Baggett, this Court decided Strickland, which involved an employee suing a railroad company by which he was employed to recover for personal injuries he sustained while on the job. See 88 So.2d at 520-21.[14] After the plaintiff prevailed in the trial court, the defendant appealed to this Court, claiming that several errors were made during the trial.[15]See id. at 521. Specifically, the defendant claimed on appeal that (1) the trial court erred in admitting several letters into evidence; and (2) various statements made by plaintiff's counsel during examination of witnesses and closing argumentconcerning those letters and other matterswere so prejudicial as to warrant a new trial. See id. Several of the letters showed that the railroad's general counsel and its doctor derived "amusement" and engaged in "hearty laughter" after receiving a report from a doctor who had examined the plaintiff. See id. at 520-21. After reviewing the content of the letters, this Court determined that "[t]here was no foundation in the evidence for admitting the letters and it was error to admit them over objection of defendant." See id. at 521. The Court then proceeded to review the various comments made by plaintiff's counsel throughout the trial. See id. at 522-23.
First, the Court reviewed comments made by plaintiff's counsel while questioning one of the plaintiff's witnesses. See id. at 521-22. In short, counsel's comments during questioning stressed the "amusement" referred to in several of the letters mentioned above, obviously attempting to elicit testimony from the witness that the plaintiff's injuries were nothing to laugh about. See id. The Court noted that defense counsel objected to many of the comments, with the trial court sustaining some of the objections and issuing a "mild rebuke" to plaintiff's counsel in several instances. See id. at 523. The Court then considered various comments made by plaintiff's counsel during closing argument relating to the lettersin which counsel expressed that he could envision the railroad's general counsel and doctor sitting in their office "laughing," feet on their desks, saying,"`Isn't this a big joke? Strickland has hurt his back, and he is having trouble with it.'" Id. at 522. Plaintiff's counsel argued that the matter was not a joke and that he would "like to wipe that smile off [general counsel's] face." Id. Finally, the Court considered comments made by plaintiff's counsel during closing argument related to a demonstration the jury had seen at the railroad yard that attempted to recreate the plaintiff's working conditions when he was injured. See id. at 522-23. Counsel repeatedly injected his personal observations about the demonstration, ultimately stating that there was no doubt in his mind that the railroad was negligent. See id. at 523. Counsel ended this portion of the argument by commenting that "I think in this case [the defendant] has pulled every sly trick in the books." Id.
*1021 After finding that defense counsel raised no objections during closing argument by plaintiff's counsel, this Court stated:
While we are committed to the rule that in the ordinary case, unless timely objections to counsel's prejudicial remarks are made, this court will not reverse the judgment on appeal, however, this ruling does not mean that if prejudicial conduct of that character in its collective impact of numerous incidents, as in this case, is so extensive that its influence pervades the trial, gravely impairing a calm and dispassionate consideration of the evidence and the merits by the jury, this court will not afford redress. In this state of the record, even though the [letters were] admissible,[[16]] the prejudicial remarks of counsel, including the statements made in argument amounting to testimony in the case, require a new trial. Courts are conscious of the fact that without partisan zeal for the cause of this client, counsel in many instances could have little success in properly representing litigants in sharply contested cases, but his conduct during the cause must always be so guarded that it will not impair or thwart the orderly processes of a fair consideration and determination of the cause by the jury.
Id. at 523 (footnote added). The Strickland Court reversed and remanded for a new trial, closing with the following comment: "It is the responsibility of the trial court to protect litigants against such interference by counsel with the orderly administration of justice and the protection of the right of the litigant to a verdict `uninfluenced by the appeals of counsel to passion or prejudice.'" Id. at 524.
Five years after deciding Strickland, this Court decided Tyus, in which the plaintiff sought recovery due to the death of her husband resulting from a collision with one of the defendant's trains. See 130 So.2d at 582. The case proceeded to trial, and a jury found in favor of the plaintiff. See id. The trial court entered judgment in favor of the plaintiff after denying the defendant's motion for new trial, and the defendant appealed to the First District. See id. at 582, 588.
On appeal, the First District determined that the evidence presented was insufficient to warrant submission to the jury and reversed with directions to enter judgment in favor of the defendant. See id. at 582; see also Apalachicola Northern Railroad Co. v. Tyus, 114 So.2d 33, 35-37 (Fla. 1st DCA 1959), quashed, 130 So.2d 580 (Fla.1961). In addition, the First District concluded that plaintiff's counsel had made improper statements during closing argument which, standing alone, constituted grounds for reversal "notwithstanding the effort of the trial court to remove their effect by instructing the jury to disregard them." Id. at 37. In denying a motion for rehearing, the First District set forth the statements made by plaintiff's counsel which the court held to be reversible error:
"It would have cost them very little to have put some kind of signals there so that the man, when he was going across that track, would have had knowledge of the fact that the train was coming out from this blinding end of the railroad; but they didn't value the life of somebody crossing that track enough to do it. * * *
"In other words, what is another man unless he can be some gain to that corporation, knowing its enterprise? What is a mere human being, dead or alive, unless he can contribute something to the fortune and future of the Apalachicola Northern Railroad?"
Id. at 38.
This Court accepted jurisdiction in the case to resolve a conflict regarding the sufficiency of the evidence issue. See Tyus, 130 So.2d at 582-83. After analyzing that issue, this Court proceeded to *1022 disagree with the First District and held that there was sufficient evidence to submit the case to the jury for determination. See id. at 586-87. This Court's view also differed from that of the First District regarding whether plaintiff's counsel's closing argument statements constituted grounds for reversal. See id. at 587. This Court noted that (1) defense counsel failed to object to the improper statements quoted in the First District's opinion; and (2) the trial court sustained objections to other improper statements and charged the jury to disregard such statements. See id. The Tyus Court reiterated the standard for reviewing unobjected-to improper statements by counsel set forth in Strickland, see id., and also referred to Baggett. See id. at 587 n. 10. Further, the Tyus Court clarified the term "pervades" as used in the Strickland standard, finding that "in order to employ the exception to the general rule where no objections are made to alleged prejudicial remarks or conduct, such remarks or conduct need not begin at the outset of a trial and continue intermittently to its conclusion." Id. at 587. In declining to reverse for a new trial, the Tyus Court closed with the following remarks:
We believe that the charge given in this case by the able circuit judge was sufficient to alleviate any harm to the defendant which might otherwise have existed by virtue of the alleged prejudicial remarks made by counsel for the petitioner only in his closing argument.
We are of the opinion that when the charge delivered by the trial judge is considered together with the fact that respondent failed to object to the alleged prejudicial remarks relied on by the District Court of Appeal as the basis for its holding on this issue, coupled with the fact that the alleged "prejudicial conduct" took place only during petitioner's closing argument and was not so extensive that its influence pervaded the trial, it is crystal clear this case should not have been reversed even for a new trial.
Moreover, it is most significant that in the instant litigation the veteran and learned trial judge, who was in the milieu of the court room throughout the trial and who was therefore in a much better position than this court or the District Court to determine whether the alleged prejudicial remarks were actually "in effect" of such character, denied a motion for a new trial.
No useful purpose would be served by submitting the factual issues in this case to a second jury for a retrial thereof because we find that such issues were fairly considered and determined by the jury....
Id. at 588.[17]
The last civil case in which this Court addressed improper, but unobjected-to, conduct by counsel during closing argument was Dupont. In that case, the subject of the litigation was an accident that occurred at a mining site. See Dupont, 455 So.2d at 1027. At the conclusion of the trial, the jury awarded the plaintiffs both compensatory and punitive damages. See id. at 1027-28. The defendants filed a motion for new trial raising several claims for reversal, including a claim that plaintiffs' counsel made inflammatory statements during closing argument. See id. at 1028. The trial court denied the motion *1023 for new trial, and the defendants appealed. See id.
On appeal, the First District affirmed the trial court's ruling on all but one basis, and the defendants sought review before this Court. See id. This Court accepted review to resolve a conflict regarding the admissibility of evidence relating to post-accident repairs, see id. at 1027, 1029, but proceeded to resolve several other issues. See id. at 1028-30. Specifically, this Court found that punitive damages should not have been assessed against the defendants, see id. at 1029, and determined that several statements made by plaintiffs' counsel during closing argument did not constitute a basis for reversal. See id. at 1030. In resolving the closing argument issue, this Court stated the following:
Petitioners argue that some of the comments made by respondent's counsel during closing argument were improper and prejudicial. These comments concerned the differences in race and economic standing between the two parties, among other things. Some latitude is permitted when arguing the amount of "smart money" to punish defendants. See, e.g., Wackenhut Corp. v. Canty, 359 So.2d 430 (Fla.1978); Tate v. Gray, 292 So.2d 618 (Fla. 2d DCA 1974); Dixie-Bell Oil Co. v. Gold, 275 So.2d 19 (Fla. 3d DCA 1973). However, since in today's decision we hold that the issue of punitive damages was improperly submitted to the jury, it was error for the trial judge to allow these comments. In any event, we hold that these comments do not amount to fundamental error, and therefore, they cannot form the basis for a new trial on appeal, since there was no timely and proper objection made by defense counsel. Tyus v. Apalachicola Northern Railroad [Co.], 130 So.2d 580, 587 (Fla.1961); Bishop v. Watson, 367 So.2d 1073 (Fla. 3d DCA 1979).
Dupont, 455 So.2d at 1030.
After analyzing this Court's decisions in Baggett, Strickland, Tyus, and Dupont, several matters are clear. First, this Court has recognized that a trial judge is in the best position to determine both the propriety of counsel's closing argument and any possible prejudice resulting from any improper argument. Second, this Court has recognized that a trial judge has a duty to prevent improper closing argument from prejudicing the jury.[18] Third, it is clear that in all but the Strickland case, the party seeking relief on the basis of improper, but unobjected-to, closing argument initially sought relief on that basis by filing a motion for new trial in the trial court. Finally, it is also clear that this Court's overarching concern in allowing an exception to the contemporaneous objection requirement in civil cases in the context of improper, but unobjected-to, closing argument is that a party should not be deprived of a fair trial and due process based on such improper argument and that public confidence in the system of justice be maintained. With these observations from prior decisions of this Court in mind, we now review how courts in other jurisdictions have addressed the issue of improper, but unobjected-to, closing argument in civil cases.

2. DECISIONS FROM OTHER JURISDICTIONS
In the decision below, the Fourth District observed that other courts in this country do not allow issues concerning improper argument to be raised for the first time on appeal in civil cases. See Murphy, 710 So.2d at 591; see also Fravel, 727 So.2d at 1036 (citing Murphy for similar proposition); Klein, Baby with the Bath *1024 Water, 26 Fla. St. U.L.Rev. at 114 (stating that "no courts outside Florida are attempting to curb improper argument in civil cases by allowing it to be raised for the first time on appeal"). Therefore, we consider the jurisprudence from other jurisdictions to assist in the formulation of a just and workable framework, and our research indicates that courts in other jurisdictions have addressed the issue. We now discuss the decisions of our sister courts.[19]

a. FEDERAL COURTS
Many of the federal appellate courts have taken similar approaches in addressing the issue of improper, but unobjected-to, closing argument. Illustrative is Smith v. Kmart Corp., 177 F.3d 19, 24-26 (1st Cir.1999), in which the First Circuit determined that the defendant could seek a new trial based on improper statements made by plaintiffs' counsel during closing argument, even though defense counsel failed to object to such argument and failed to address such argument in a motion for new trial filed in the trial court. The First Circuit found that even in the absence of a contemporaneous objection to the allegedly improper argument, an appellate court may conduct a "plain error" review of the improper argument. See id. at 25-26. The Second, Fifth, Sixth, Eight, Ninth, and Eleventh Circuits have taken approaches similar to that of the First Circuit. See, e.g., Greenway v. Buffalo Hilton Hotel, 143 F.3d 47, 51 (2d Cir.1998) (finding that an appellate court may reverse for a new trial in a civil case based on improper, but unobjected-to, closing argument only for plain error); Strickland v. Owens Corning, 142 F.3d 353, 358-59 (6th Cir. 1998) (recognizing exception to contemporaneous objection requirement in civil case where conduct of counsel is outrageous); Oxford Furniture Cos. v. Drexel Heritage Furnishings, Inc., 984 F.2d 1118, 1128-29 (11th Cir.1993) (finding that improper, but unobjected-to, closing argument in a civil case may be reviewed by appellate court only for plain error); Manning v. Lunda Constr. Co., 953 F.2d 1090, 1092-93 (8th Cir.1992) (quoting Thomure v. Truck Ins. Exch., 781 F.2d 141, 143 (8th Cir.1986), for the proposition that "[w]hen statements in a closing argument are not objected to at trial, we may only review them on a plain error standard"); Kaiser Steel Corp. v. Frank Coluccio Constr. Co., 785 F.2d 656, 658 (9th Cir.1986) (recognizing "high threshold" party must meet where no objection made to improper closing argument; finding no "fundamental error"); Rojas v. Richardson, 703 F.2d 186, 190 (5th Cir.) (reviewing improper, unobjected-to closing argument in a civil case for plain error and finding that argument rose to the level of plain error), modified on rehearing, 713 F.2d 116 (5th Cir.1983) (reversing earlier plain error finding based on supplemental record information). Based on these decisions, it is clear that many federal appellate courts have recognized an exception to the contemporaneous objection requirement in civil cases in this context. However, those courts have seldom granted relief in cases where counsel failed to contemporaneously object to improper argument. See, e.g., Smith, 177 F.3d at 26-28 (stating that "[p]lain error is a `rare species in civil litigation,' encompassing only those errors that reach the `pinnacle of fault'" and finding that plaintiffs' counsel's improper, but unobjected-to, closing argument did not warrant reversal for a new trial).

b. STATE COURTS
State courts have taken more varied approaches than the federal appellate courts in addressing the issue of improper, but unobjected-to, closing argument in civil cases. Some state courts have created a bright-line rule: if counsel fails to timely object to improper closing argument made by opposing counsel, then such argument cannot form the basis for a new trial. See, e.g., Copeland v. City of Yuma, 160 Ariz. *1025 307, 772 P.2d 1160, 1162-63 (App.1989); Kempner v. Schulte, 318 Ark. 433, 885 S.W.2d 892, 894 (1994); Rego Co. v. McKown-Katy, 801 P.2d 536, 540 (Colo. 1990); Whitley v. Gwinnett County, 221 Ga.App. 18, 470 S.E.2d 724, 730 (1996); Cooper v. United Southern Assurance Co., 718 So.2d 1029, 1037-39 (La.Ct.App.1998); cf. Johnson v. Emerson, 103 Idaho 350, 647 P.2d 806 (App.1982) (finding that exception to improper closing argument is timely if made before case is submitted to the jury); Siler v. City of Kansas City, 211 Kan. 258, 505 P.2d 765, 766 (1973) (finding that improper closing argument was not available as basis for reversing judgment where counsel for the party seeking relief did not object, request a curative instruction, or move for a mistrial based on such improper argument). Other state courts have allowed parties to seek relief based on improper closing argument, even in the absence of a timely objection, although the standards for obtaining relief have varied significantly. See, e.g., Hill v. Sherwood, 488 So.2d 1357 (Ala.1986) (relief warranted only "where counsel's remarks were so grossly improper and highly prejudicial as to be beyond corrective action by the trial court") (quoted source omitted); Rizzo Pool Co. v. Del Grosso, 232 Conn. 666, 657 A.2d 1087, 1097 (1995) (relief warranted only where party can show it is "necessary to remedy a manifest injustice"); Medical Center of Delaware, Inc. v. Lougheed, 661 A.2d 1055, 1060 (Del.1995) (relief warranted only where improper remarks amount to "plain error"); Zoerner v. Iwan, 250 Ill.App.3d 576, 189 Ill.Dec. 191, 619 N.E.2d 892, 899-900 (1993) (stating that "despite the absence of an objection, a reviewing court may consider claims of improper statements during closing argument to the extent such statements prevented a fair trial"); Miller v. Szelenyi, 546 A.2d 1013, 1018 (Me.1988) (reviewing unobjected-to closing argument only for "obvious error"); Reetz v. Kinsman Marine Transit Co., 416 Mich. 97, 330 N.W.2d 638, 641-42 (1982) ("Where improper conduct by one or both parties influences the outcome of a trial, an appellate court may reverse although the appellant's attorney did not seek to cure the error."); Molkenbur v. Hart, 411 N.W.2d 249, 254 (Minn.Ct.App.1987) (relief warranted only where trial court should have stepped in, sua sponte, and given curative instructions); Nisivoccia v. Ademhill Assocs., 286 N.J.Super. 419, 669 A.2d 822, 825 (App.Div.1996) (reviewing unobjected-to closing argument only for "plain error"); City of Bellevue v. Kravik, 69 Wash.App. 735, 850 P.2d 559, 564 (1993) ("Absent an objection to counsel's remarks, the issue of misconduct cannot be raised on appeal unless the misconduct is so flagrant and ill intentioned that no curative instructions could have obviated the prejudice engendered by the misconduct."). Finally, several state courts have held that a party may not seek relief in an appellate court based on improper, but unobjected-to, closing argument unless such argument is first brought to the attention of the trial court by way of a post-trial motion. See, e.g., Dial v. Niggel Assocs. Inc., 333 S.C. 253, 509 S.E.2d 269, 271 (1998); Austin v. Shampine, 948 S.W.2d 900, 906 (Tex.Ct.App.1997). The varied approaches taken by our sister courts in addressing a common issue show that there are substantial policy concerns on both sides of the debate regarding whether there should be an exception to the contemporaneous objection requirement in civil cases in this context. We now consider those policy concerns.

3. POLICY CONCERNS
In Fravel, 727 So.2d at 1038-39 (Cobb, J., concurring specially), Judge Cobb succinctly summarized the focus of the competing policy concerns regarding this subject when he stated:
The basic conflict is exemplified by the clash between the opinion of Judge Schwartz in Borden, Inc. v. Young, 479 So.2d 850 (Fla. 3d DCA 1985), rev. denied, 488 So.2d 832 (Fla.1986), and that of Judge Klein in Murphy, and derives from a difference in focus: the former is primarily concerned with correcting reprehensible *1026 attorney misconduct during closing argument; the latter with the proper preservation of trial error and appellate predictability. Formidable arguments are available on both sides of this issue....
In Goldfuss v. Davidson, 79 Ohio St.3d 116, 679 N.E.2d 1099, 1103 (1997), the Supreme Court of Ohio used similar language while addressing whether the "plain error" doctrine should apply in civil cases: "Reviewing courts desire to see justice done; they also appreciate the importance of consistent application of procedural rules which promote expeditious and uniform resolution of disputes in our adversary system of litigation." We must consider the various policy concerns summarized in Fravel and Goldfuss.
Several policy concerns weigh against an exception to the contemporaneous objection requirement under the circumstances of improper arguments. First, if counsel contemporaneously objects to improper closing argument, such objection can deter opposing counsel from making further improper argument, thus preventing improper argument from becoming cumulative. Second, requiring a contemporaneous objection prevents counsel from engaging in "sandbagging" tactics, whereby counsel may intentionally refrain from objecting to improper closing argument, hoping to prevail despite such argument, and then seek relief based on the unobjected-to argument in the event that the desired outcome in the case is not achieved. See, e.g., Lowe Invest. Corp. v. Clemente, 685 So.2d 84, 85 (Fla. 2d DCA 1996) ("Trial counsel simply cannot allow error to occur without objection, hope they will win in spite of the error, and be confident of a new trial when the trial court has not been afforded an opportunity to cure the error. The cases are legion that warn trial counsel they cannot have their cake and eat it too."). Relatedly, precluding relief absent a contemporaneous objection accounts for the possibility that counsel may, as a tactical decision, refrain from objecting to opposing counsel's improper argument based on the belief that such improper argument actually hurts opposing counsel's rapport with the jury. Cf. Nelson v. Reliance Ins. Co., 368 So.2d 361, 362 (Fla. 4th DCA 1978). Also, requiring a contemporaneous objection provides the trial judge, who is in the best position to evaluate the propriety and possible impact of allegedly improper closing argument, with the optimal opportunity to stop such argument when it is made. Finally, requiring a contemporaneous objection helps prevent confusion that can stem from appellate courts making "cold record" decisions regarding improper closing argument. See, e.g., Klein, Baby with the Bath Water, 26 Fla. St. U.L.Rev. at 109-15.
Juxtaposed against the policy concerns just discussed is the overarching concern that a litigant receive a fair trial and that our system operate so as to deserve public trust and confidence. Indeed, the concern that civil litigants receive a fair trial undoubtedly was this Court's primary concern in recognizing an exception to the contemporaneous objection requirement in Baggett, Strickland, Tyus, and Dupont. However, as evidenced by the present case, Florida's courts have had difficulty balancing the right to a fair trial with the competing policy concerns discussed above. We now attempt to strike such a balance. The policy considerations favoring a bright-line rule requiring an objection are, most assuredly, attractive. However, we believe an escape valve with a very narrowly defined parameter and of extremely limited application is essential to maintain public trust in our jury trial system. Additionally, the manner in which review of the issue is conducted needs limitation.

4. CONCLUSION
After considering this Court's prior decisions, the analysis of each of our District Courts of Appeal, the decisions of courts in other jurisdictions, as well as the policy concerns discussed above, we find that the time has come to restate the approach to be taken regarding the issue *1027 of improper, but unobjected-to, closing argument in civil cases. It has become increasingly clear that the problem is not so much whether an exception exists, but, on the contrary, the difficulty has been generated by a lack of appellate uniformity and a failure at the appellate level to apply a very narrow and limited parameter of "fundamental error." Accordingly, we now hold that a civil litigant may not seek relief in an appellate court based on improper, but unobjected-to, closing argument, unless the litigant has at least challenged such argument in the trial court by way of a motion for new trial even if no objection was voiced during trial. This approach is similar to that taken by our sister courts in South Carolina and Texas, see Dial, 509 S.E.2d at 271; Austin, 948 S.W.2d at 906, and we find that such approach adequately promotes the need for procedural rules, which enhance predictability in the resolution of cases, while also recognizing that justice may require relief in certain very limited situations even when established procedural rules have not been followed. Moreover, this approach ensures that the trial judge, who is in the best position to determine the propriety and potential impact of allegedly improper closing argument, has an opportunity to make a such a determination. In holding as we do, we recede from this Court's prior decisions in Baggett, Strickland, Tyus, and Dupont to the extent that those decisions stand for the proposition that improper, but unobjected-to, closing argument in a civil case may be challenged for the first time on appeal.[20] We also disapprove decisions issued by Florida's District Courts of Appeal to the extent that they stand for such proposition.
In adopting this method of analysis, we have disposed of the first question posed above; namely, whether an exception to the contemporaneous objection requirement should continue to exist in civil cases in the context of improper, but unobjected-to, closing argument. However, we are mindful that adopting this approach does not clarify the appropriate standard for determining whether relief should be granted in post-trial proceedings at the trial level when no objection was presented during trial but the issue is presented in a motion for new trial. Therefore, we must now address the appropriate standard to be applied by the trial court.

C. THE APPROPRIATE STANDARD
In Baggett, Strickland, Tyus, and Dupont, this Court set forth different standards for determining whether relief should be granted in a civil case based on improper, but unobjected-to, closing argument. In Baggett, this Court focused on whether the improper argument was, in effect, incurable, see 124 Fla. at 717, 169 So. at 379; in Strickland and Tyus, this Court focused on the cumulativeness of the improper argument and whether such argument "gravely impair[s] a calm and dispassionate consideration of the evidence and the merits by the jury," 88 So.2d at 523, 130 So.2d at 587; and in Dupont, this Court stated that improper, but unobjected-to, closing argument cannot form the basis of a new trial unless such argument constitutes "fundamental error." 455 So.2d at 1030. Further, Florida's District Courts of Appeal have applied different standards for determining whether relief should be granted when the situation arises. See, e.g., Murphy, 710 So.2d at 587; D'Auria v. Allstate Insurance Co., 673 So.2d 147, 147 (Fla. 5th DCA 1996) (Antoon, J., concurring) ("Recent case law from the various district courts has provided little guidance on the question of when unpreserved error justifies reversal."); Hagan v. Sun Bank of Mid-Florida, N.A., 666 So.2d 580, 583 (Fla. 2d DCA 1996) ("Confusion, if not conflict, exists concerning the tests that trial courts should apply in granting or denying a new trial based *1028 on preserved or fundamental error in closing argument and the standards of review that appellate courts should apply ...."); see also Michael A. Kamen, Summation, in Florida Civil Trial Practice 48, 50 (1998) ("There is a divergence among the district courts about the propriety of granting a new trial in a civil case based on improper, but unobjected to, closing argument."). We now attempt to eliminate the confusion over the appropriate standard and outline the standard to be applied by the trial court when considering unobjected-to statements on a motion for new trial.

1. THE CHALLENGED ARGUMENT MUST BE IMPROPER
To receive a new trial in a civil case based on unobjected-to closing argument, a complaining party must first establish that the argument being challenged is, in fact, improper. In determining whether the argument being challenged is improper, a trial judge should be guided by the following principles.
The purpose of closing argument is to help the jury understand the issues in a case by "applying the evidence to the law applicable to the case." Hill v. State, 515 So.2d 176, 178 (Fla.1987). Attorneys should be afforded great latitude in presenting closing argument, but they must "confine their argument to the facts and evidence presented to the jury and all logical deductions from the facts and evidence." Knoizen v. Bruegger, 713 So.2d 1071, 1072 (Fla. 5th DCA 1998); see also Venning v. Roe, 616 So.2d 604 (Fla. 2d DCA 1993). Moreover, closing argument must not be used to "inflame the minds and passions of the jurors so that their verdict reflects an emotional response ... rather than the logical analysis of the evidence in light of the applicable law." Bertolotti v. State, 476 So.2d 130, 134 (Fla. 1985).
Attorneys presenting closing argument in Florida courts, whether in criminal or civil trials, are governed by rule 4-3.4 of the Rules Regulating The Florida Bar. Rule 4-3.4 states:
A lawyer shall not ... in trial, allude to any matter that the lawyer does not reasonably believe is relevant or that will not be supported by admissible evidence, assert personal knowledge of facts in issue except when testifying as a witness, or state a personal opinion as to the justness of a cause, the credibility of a witness, the culpability of a civil litigant, or the guilt or innocence of an accused.
R. Regulating Fla. Bar 4-3.4(e). The underpinnings of this ethical rule are well-founded; it not only prevents lawyers from placing their own credibility at issue in a case, it also limits the possibility that the jury may decide a case based on non-record evidence. See Davis v. South Florida Water Management Dist., 715 So.2d 996, 999 (Fla. 4th DCA 1998): Forman v. Wallshein, 671 So.2d 872, 875 (Fla. 3d DCA 1996). In sum, rule 4-3.4 is in place to help ensure that juries render verdicts based on record evidence and applicable law, not based on impermissible matters interjected by counsel during closing argument.
While we do not attempt to list here all of the various types of improper argument, we do wish to clarify several matters regarding how rule 4-3.4 should be interpreted. First, it is not improper for counsel to state during closing argument that a witness "lied" or is a "liar," provided such characterizations are supported by the record. See Craig v. State, 510 So.2d 857, 865 (Fla.1987) (finding that even though intemperate, prosecutor's closing argument remarks characterizing defendant's testimony as untruthful and the defendant himself as being a "liar" did not exceed the bounds of proper argument in view of the record evidence); Forman, 671 So.2d at 874 (refusing to find improper counsel's closing argument characterization of plaintiff as being a liar where "there was an ample evidentiary basis on which to dispute the credibility of the *1029 plaintiff"); see also Goutis v. Express Transport, Inc., 699 So.2d 757, 763-64 (Fla. 4th DCA 1997) (agreeing with Forman). If the evidence supports such a characterization, counsel is not impermissibly stating a personal opinion about the credibility of a witness, but is instead submitting to the jury a conclusion that reasonably may be drawn from the evidence.[21]
Second, use of the personal pronoun "I" during closing argument is not, in and of itself, improper. On this issue, we agree with the Third District's analysis in Forman, wherein the court reviewed several treatises and concluded that defense counsel's use of the phrases "I think" and "I believe" did not impermissibly express a personal opinion, but was instead merely a figure of speech. See 671 So.2d at 874-75 (reviewing Thomas A. Mauet, Fundamentals of Trial Techniques 366 (3d ed.1992), and Steven Lubet, Modern Trial Advocacy Analysis and Practice, 432-33 (1993)). When determining whether counsels' use of the personal pronoun "I" is improper, judges must not place form over substance; it must be understood that trial counsel is required to analyze the evidence and present reasonable interpretations and inferences based on the evidence to the jury.

2. THE ARGUMENT MUST BE HARMFUL
Should a complaining party establish that the unobjected-to argument being challenged is improper, the party must then also establish that the argument being challenged is harmful.[22]See, e.g., § 59.041, Fla. Stat. (1999); Weise v. Repa Film Int'l, Inc., 683 So.2d 1128 (Fla. 4th DCA 1996) (declining to grant new trial based on allegedly improper closing argument where complaining party failed to establish that such argument was harmful). In imposing this harmfulness requirement, we recognize that "there is a temptation for both trial courts and appellate courts to use the remedy of new trial as a tool to punish misconduct of an attorney." Hagan, 666 So.2d at 584. However, closing argument that is violative of rule 4-3.4 does not necessarily constitute harmful error. See, e.g., Winterberg v. Johnson, 692 So.2d 254, 255 (Fla. 1st DCA 1997). Although courts have a supervisory role in overseeing the conduct of attorneys, the primary concern of courts must be how the improper closing argument affected the fairness of the trial proceedings. Thus, we agree with the Fifth District's statement in Fravel that, in many cases, "[w]hen argument descends to the level of ethical violations, there are other ways to address the transgression than reversal of a jury verdict." 727 So.2d at 1036; cf. United States v. Hasting, 461 U.S. 499, 506, 103 S.Ct. 1974, 76 L.Ed.2d 96 (1983) (finding that court should not exercise supervisory power to reverse jury verdict based on improper closing argument where such argument is harmless and where "means more narrowly tailored to deter objectionable prosecutorial conduct are available"). We in no way condone improper comments but conclude the litigation process is intended to resolve the pending dispute, not provide a mechanism to deal with wayward lawyers.
Harmfulness in this context also carries a requirement that the comments be so highly prejudicial and of such collective impact as to gravely impair a fair consideration and determination of the case by the jury. Passing remarks of little *1030 consequence in the scope of a lengthy trial should find little sympathy if no contemporaneous objection is voiced. The extensiveness of the objectionable material is a factor to be considered in the harmfulness analysis. In sum, the improper closing argument comments must be of such a nature that it reaches into the validity of the trial itself to the extent that the verdict reached could not have been obtained but for such comments.

3. THE ARGUMENT MUST BE INCURABLE
Should a complaining party establish that the unobjected-to closing argument being challenged is both improper and harmful, the party must then establish that the argument is incurable. Specifically, a complaining party must establish that even if the trial court had sustained a timely objection to the improper argument and instructed the jury to disregard the improper argument, such curative measures could not have eliminated the probability that the unobjected-to argument resulted in an improper verdict. This concept of "incurability" can be traced back to the Baggett standard that a timely objection to improper closing argument is required before a new trial may be granted based on such argument unless "the improper remarks are of such character that neither rebuke nor retraction may entirely destroy their sinister influence." 124 Fla. at 717, 169 So. at 379. As evidenced in Akin and Baggett, it will be extremely difficult for a complaining party to establish that the unobjected-to argument is incurable.

4. THE ARGUMENT MUST BE SUCH THAT IT SO DAMAGED THE FAIRNESS OF THE TRIAL THAT THE PUBLIC'S INTEREST IN OUR SYSTEM OF JUSTICE REQUIRES A NEW TRIAL
Should a complaining party establish that the unobjected-to argument being challenged was improper, harmful, and incurable, the party finally must also establish that the argument so damaged the fairness of the trial that the public's interest in our system of justice requires a new trial. See Hagan, 666 So.2d at 586; Klein, Baby with the Bath Water, 26 Fla. St. U.L.Rev. at 122-23; cf. Goldfuss, 679 N.E.2d at 1104 (holding that in civil cases, the plain error doctrine is applicable "only in the extremely rare case involving exceptional circumstances where error, to which no objection was made at the trial court, seriously affects the basic fairness, integrity, or public reputation of the judicial process, thereby challenging the legitimacy of the underlying judicial process itself"). Although we do not specifically limit the types of improper argument that may fit within this category, we recognize that the category necessarily must be narrow in scope. For example, closing argument that appeals to racial, ethnic, or religious prejudices is the type of argument that traditionally fits within this narrow category of improper argument requiring a new trial even in the absence of an objection.

5. STANDARD OF REVIEW ON APPEAL
If a complaining party establishes that the unobjected-to argument being challenged was improper, harmful, incurable, and so damaged the fairness of the trial that the public's interest in our system of justice requires a new trial, then the complaining party is entitled to a new trial.[23] We agree with the Second District that, when granting a new trial based on unobjected-to closing argument, the trial court must specifically identify the improper arguments of counsel and the actions of the jury resulting from those arguments. See Hagan, 666 So.2d at 583 (relying on Wasden v. Seaboard Coast Line R.R., 474 So.2d 825, 830 (Fla. 2d DCA 1985)); cf. Fla. R. Civ. P. 1.530(f) (stating that "[a]ll orders granting a new trial shall specify the specific grounds therefor"). On appeal, the appellate court must then apply an abuse of discretion standard in reviewing *1031 either the trial court's grant or denial of a new trial based on the unobjected-to closing argument.[24]Cf., e.g., Brown v. Estate of A.P. Stuckey, 749 So.2d 490, 498 (Fla.1999) ("Regardless of whether a new trial was ordered because the verdict was excessive or inadequate or was contrary to the manifest weight of the evidence, the appellate court must employ the reasonableness test to determine whether the trial judge abused his or her discretion."). We find that appellate courts must apply the abuse of discretion standard of review because applying such standard sufficiently recognizes that the trial judge is in the best position to determine the propriety and potential impact of allegedly improper closing argument.[25]

6. CONCLUSION
In conclusion, we hold that before a complaining party may receive a new trial based on unobjected-to closing argument, the party must establish that the argument being challenged was improper, harmful, incurable, and so damaged the fairness of the trial that the public's interest in our system of justice requires a new trial. Should the trial court find that these criteria have been established, the court must enter an order granting a new trial specifically identifying both the improper arguments of counsel and the actions of the jury resulting from those arguments. Finally, an appellate court must employ an abuse of discretion standard of review when considering the correctness of the trial court's grant or denial of a new trial based on unobjected-to closing argument. Although we have not absolutely "closed the door" on appellate review of unpreserved challenges to closing argument, we have come as close to doing so as we believe consistent with notions of due process which deserve public trust in the judicial system. With these standards in mind, we now review the closing argument being challenged in the present case.

IV. ANALYZING THE CHALLENGED ARGUMENT IN THIS CASE
At the outset, we note that Plaintiffs' counsel failed to raise any objections during closing argument made by counsel for UTC/UTOS, nor did Plaintiffs' counsel request a curative instruction or a mistrial during or at the close of such argument. As noted above, however, Plaintiffs' counsel did challenge various portions of opposing counsel's closing argument by way of a motion for new trial,[26] which was summarily *1032 denied by the trial court. Accordingly, we must determine whether the trial court abused its discretion in denying the Plaintiffs' motion for new trial on the basis of allegedly improper, but unobjected-to, closing argument made by counsel for UTC/UTOS. After reviewing the closing argument being challenged, as well as the entire record in this case, we find that the trial judge did not abuse his discretion in denying the Plaintiffs' motion for new trial.
We agree with the Plaintiffs that portions of the closing argument now being challenged were indeed improper, especially (1) counsel's repeated use of the term "B.S. detector"; (2) counsel's comment that if the jury found for the Plaintiffs on the consultancy agreement claim, the jury would be "accessories, after the fact, to tax fraud"; and (3) counsel's characterization of the Plaintiffs' case as cashing in on a "lottery ticket." However, we do not find improper counsel's comments regarding Murphy's credibility, as there was sufficient record evidence to support counsel's questioning of Murphy's credibility. More importantly, it is clear that a reasonable jurist could conclude that the improper closing argument made by counsel for UTC/UTOS was not harmful, incurable, or of a character to so damage the fairness of the trial that the public's interest in our system of justice requires a new trial. Accordingly, based on the foregoing, we approve the Fourth District's affirmance of the trial court's denial of the Plaintiffs' motion for new trial.
It is so ordered.
WELLS, C.J., and SHAW, HARDING and QUINCE, JJ., concur.
PARIENTE, J., concurs specially in result only with an opinion, in which ANSTEAD, J., concurs.
PARIENTE, J., concurring specially in result only.
I concur in the result reached by the majority and commend Justice Lewis's scholarly analysis. I agree with the majority's rejection of the Fourth District's bright-line rule in Murphy that would preclude reversal if no objection to the improper argument was registered at trial. See majority op. at 1026. Further, even under our prior case law, the unobjected-to arguments in this case do not constitute fundamental error.
I am concerned, however, that the majority's newly formulated four-prong test[27] for fundamental error might unnecessarily restrict the authority of trial courts to grant new trials. Further, although I generally agree with the majority's requirement that the trial court first evaluate the unobjected-to improper argument in a motion for new trial, I would still retain the right of appellate courts to reverse for fundamental error where the conduct "so damaged the fairness of the trial that the public's interest in our system of justice requires a new trial." Majority op. at 1030. The appellate courts should exercise this right, however, only in those rare cases where the public's confidence in the judicial process would be seriously undermined if the improper argument went uncorrected.
I reach this conclusion because the primary reason to continue to embrace the "fundamental error" doctrine based on unobjected-to closing argument in civil cases, or the "plain error" doctrine as the term is used by many other state and *1033 federal jurisdictions,[28] is to ensure the fundamental fairness of the judicial process and the public trust and confidence in what transpires in our halls of justice. Accordingly, I regard the conflict represented by the competing viewpoints in this case as more than simply a dispute between whether it is more important to correct "reprehensible attorney misconduct during closing argument" or whether it is more important to promote the principle of "proper preservation of trial error and appellate predictability." Majority op. at 1025 (quoting Fravel v. Haughey, 727 So.2d 1033, 1038-39 (Fla. 5th DCA 1999) (Cobb, J., concurring specially)). In addition, I agree that the fundamental error principle should not be used by courts to enforce compliance with ethical standards or to sanction lawyer misconduct. Other methods are available when those issues require redress.[29]
The fundamental or plain error doctrine recognizes the public responsibility of the appellate court to reverse when the improper misconduct during closing argument "seriously affects the basic fairness, integrity, or public reputation of the judicial process, thereby challenging the legitimacy of the underlying judicial process itself." Goldfuss v. Davidson, 79 Ohio St.3d 116, 679 N.E.2d 1099, 1104 (1997). In recognizing this important interest in Seaboard Air Line R.R. Co. v. Strickland, 88 So.2d 519, 524 (Fla.1956), we quoted with approval the following statement from the United States Supreme Court:
[A] trial in court is never, as respondents in their brief argue this one was, "purely a private controversy ... of no importance to the public." The state, whose interest it is the duty of court and counsel alike to uphold, is concerned that every litigation be fairly and impartially conducted and that verdicts of juries be rendered only on the issues made by the pleadings and the evidence. The public interest requires that the court of its own motion, as is its power and duty, protect suitors in their right to a verdict, uninfluenced by the appeals of counsel to passion or prejudice. Where such paramount considerations are involved, the failure of counsel to particularize an exception will not preclude this court from correcting the error.
New York Cent. R.R. v. Johnson, 279 U.S. 310, 318-19, 49 S.Ct. 300, 73 L.Ed. 706 (1929). As Judge Altenbernd has explained:
Although fundamental error is extraordinarily difficult to define, the doctrine functions to preserve the public's confidence in the judicial system. Relief is granted for a fundamental error not because the party has preserved a right to relief from a harmful error, but because the public's confidence in our system of justice would be seriously weakened if the courts failed to give relief as a matter of grace for certain, very limited and serious mistakes.
Hagan v. Sun Bank of Mid-Florida, 666 So.2d 580, 584 (Fla. 2d DCA 1996).
In this case, the majority has rejected the Fourth District's bright-line rule abolishing fundamental error in civil cases and instead has recognized "an escape valve with a very narrowly defined parameter and of extremely limited application." Majority op. at 1026. At the same time, the majority has also included an additional requirement that the trial court should *1034 first evaluate the impact of the objectionable, but not objected-to, closing argument.
I generally agree with the requirement that the objectionable closing argument remarks should first be addressed by the trial court through a post-trial motion. This requirement is a sound one because of the trial court's unique ability to evaluate the impact of the allegedly improper argument along with other conduct that the litigant claims forms the basis for a new trial. Because appellate courts have only the written record by which to evaluate the impact of the argument, undue emphasis may be placed on a comment that was innocuous at the time it was uttered. This is especially true with arguments involving words such as "you" or "I," that often may be misconstrued and that rarely constitute the type of highly prejudicial or inflammatory argument precluding dispassionate consideration of the evidence. See majority op. at 1029. In addition, review by the trial court would provide the appellate court with the benefit of the trial court's assessment of the allegedly improper remarks and their impact, or lack of, on the trial.
Long ago, we acknowledged that it is the trial judge's responsibility, as the impartial judicial officer in charge of the proceeding, "to protect litigants against such interference by counsel with the orderly administration of justice and the protection of the right of the litigant to a verdict `uninfluenced by the appeals of counsel to passion or prejudice.'" Strickland, 88 So.2d at 524. Recently, we reiterated the trial court's broad discretionary power to grant a new trial when a verdict is against the manifest weight of the evidence and we explained that "this discretionary power emanates from the common law principle that it is the duty of the trial judge to prevent what he or she considers to be a miscarriage of justice." Brown v. Estate of Stuckey, 749 So.2d 490, 495 (Fla. 1999).
Despite my general agreement with the requirement that the trial court first evaluate the effect of the unobjected-to closing argument, I disagree with the majority as to the standard the trial court should follow when evaluating the effect of the unobjected-to closing argument. In my opinion, the trial court should have the power to grant a new trial based on pervasive, improper closing argument when necessary to prevent a miscarriage of justice. In other words, I would enunciate a two-part test that would allow trial courts to grant a new trial based on unobjected-to closing argument where the trial court finds that: (1) the improper remarks are incurable; that is, the trial court finds the remarks to be "of such character that neither rebuke nor retraction may entirely destroy their sinister influence," Baggett v. Davis, 124 Fla. 701, 717, 169 So. 372, 379 (1936); and (2) "the prejudicial conduct in its collective import is so extensive that its influence pervades the trial, gravely impairing a calm and dispassionate consideration of the evidence and the merits by the jury." Tyus v. Apalachicola N. R.R., 130 So.2d 580, 587 (Fla.1961); see also Strickland, 88 So.2d at 523.
A standard that would allow trial courts to evaluate cases under this two-part analysis would blend our prior case law on fundamental error as set forth in Baggett, Strickland and Tyus and would be more consistent with the approach taken by those states that require evaluation by a trial court. See Austin v. Shampine, 948 S.W.2d 900, 906 (Tex.Ct.App.1997) (reversing only where issue preserved through motion for mistrial and where the argument is so inflammatory that its harmful or prejudicial nature cannot be cured by an instruction to disregard); Dial v. Niggel Assocs., Inc., 333 S.C. 253, 509 S.E.2d 269, 271 (1998) (even where there has not been a contemporaneous objection, a new trial motion should be granted "in flagrant cases where a vicious inflammatory argument results in clear prejudice"). In contrast, the stringent four-part test set forth by the majority risks undermining the major tenet of both Tyus and Strickland, that "the judge in the milieu of the trial courtroom is in the best position to gauge the *1035 actual effect of prejudicial remarks and deal with them accordingly." Fravel, 727 So.2d at 1039 (Cobb, J. concurring specially).[30]
I also write to emphasize that the majority opinion should not be read to condone arguments that permit the "noble art of trial practice" to at times "degenerate into a free-for-all." Nelson v. Reliance Ins., 368 So.2d 361, 361 (Fla. 4th DCA 1978). As Judge Schwartz observed long ago, it is unacceptable "for the judiciary to act simply as a fight promoter, who supplies an arena in which parties may fight it out on unseemly terms of their own choosing." Borden, Inc. v. Young, 479 So.2d 850, 851 (Fla. 3d DCA 1985). Thus, it remains the duty of trial judges to admonish lawyers to refrain from improper closing argument. See Fravel, 727 So.2d at 1036 ("[W]e find it troubling that trial judges are reluctant to curb the abuse perpetrated by trial counsel in the area of improper comments made during closing arguments."). I have no doubt that many trial judges take this responsibility seriously.
Even those judges who may be reluctant to step in during closing argument do not hesitate to issue instructions to lawyers before closing argument reminding the litigants what is and what is not proper argument based on the plethora of appellate decisions that have previously identified the limits of proper advocacy. For these reasons, and to provide further guidance for the trial courts and trial lawyers as to the permissible bounds of advocacy, I urge appellate courts to continue to report the actual substance of the remarks that they deem objectionable, and to explain why they are objectionable.
The type of closing arguments to which I refer are not simply those advanced by lawyers engaged in zealous advocacy or ones that contain words such as "ridiculous"[31] or other colorful adjectives. Instead, I am referring to those clear instances of a lawyer's attempt to appeal to juries' passions and prejudices by drawing attention to impermissible considerations outside of the record. Arguments about "[w]hat other lawyers have done, what has occurred in other law suits, and what other corporations have done," are examples of arguments that are clearly outside the bounds of vigorous but acceptable advocacy. Bellsouth Human Resources Admin., Inc. v. Colatarci, 641 So.2d 427, 430 (Fla. 4th DCA 1994).
As much as it is the primary responsibility of trial lawyers to lodge proper, specific and timely objections and the responsibility of the trial court to maintain a fair and orderly trial, we, at the appellate level, cannot abdicate all responsibility. Although there are many sound reasons why a litigant should not be "rewarded" because his or her attorney strategically decides not to object, it is important that appellate courts nonetheless retain the right to address fundamental error. As Judge Dauksch explained in his specially concurring opinion in Fravel:
It is not a matter of who is at faultthe offending lawyer who misbehaves, or the negligent or crafty lawyer on the other side who does not object, or the trial *1036 judge who shirks his duty to intercede. It is a matter of fundamental fairness and this court's duty to see to it that all litigants are given their due in court. That is the primary reason for having courts of appeal.
727 So.2d at 1038 (Dauksch, J., concurring specially). If we simply preclude consideration of fundamental error in civil cases, the danger, as Judge Sharp observes, is that "we ourselves, as appellate judges, have all but disappeared from this equation, like the Chesire Cat, fading behind a smile in search of a `bright line,' leaving only the trial judges to fight the battle." Id. at 1040 (Sharp, J., dissenting).[32]
ANSTEAD, J., concurs.
NOTES
[1] In the decision below, the Fourth District identified decisions from the First, Third, and Fifth District Courts of Appeal with which it disagreed. See Murphy v. Int'l Robotics Sys., Inc., 710 So.2d 587, 587 n. 1 (Fla. 4th DCA 1998). After the Fourth District decided Murphy, however, the Fifth District issued its decision in Fravel v. Haughey, 727 So.2d 1033, 1034-37 (Fla. 5th DCA 1999) (en banc), wherein the court essentially aligned itself with the Fourth District on the issue of improper, but unobjected-to, closing argument in civil cases. Thus, conflict no longer exists between decisions from the Fourth and Fifth Districts.
[2] Our decision here does not affect the law in criminal cases regarding improper, but unobjected-to, closing argument. Further, this decision does not impact the legal standards applicable to consideration of the issue that has been properly preserved by objection and motion for mistrial, which remains whether the comment was highly prejudicial and inflammatory. See, e.g., Hagan v. Sun Bank of Mid-Florida, N.A, 666 So.2d 580, 585 (Fla. 2d DCA 1996). The rules and standards applicable to preserved and unobjected-to comments are substantially different.
[3] The judgment in favor of the Defendants did not include Laser, however, because the trial court previously had entered a default judgment as to liability against that business entity. The Plaintiffs moved for a new trial on damages in relation to Laser, but the trial court denied that motion. The validity of that denial is not before this Court for review.
[4] Hornsby, individually, was not included as a defendant oh the counts relating to the "Commission Agreement" and the "Consulting Agreement."
[5] The breach of fiduciary duty and misappropriation/concealment claims concerned only Hornsby individually, not the other defendants.
[6] The Plaintiffs noted in their motion for new trial that counsel for Hornsby and Robotic Systems II had not participated in the "offending argument." However, the Plaintiffs argued that the trial court should grant a new trial against every defendant (except for Laser, see supra note 3), including Hornsby and Robotic Systems II, because every defendant benefitted from the improper argument made by counsel for UTC/UTOS. In support of this argument, the Plaintiffs relied on the Third District's decision in Owens Corning Fiberglas Corp. v. Morse, 653 So.2d 409, 412 (Fla. 3d DCA 1995), wherein the court granted a new trial against every defendant based upon improper closing argument made by counsel for only one defendant.
[7] Sometime after the trial concluded, the Plaintiffs settled all claims against UTC/ UTOS. Therefore, those business entities are not involved in the present proceedings before this Court.
[8] The Fourth District also considered and rejected on the merits "the other issues" raised by the Plaintiffs, but the court in its opinion did not identify the substance of those other issues. See Murphy, 710 So.2d at 591.
[9] As noted above, the Fourth District issued its decision in Murphy before the Fifth District issued its decision in Fravel. See supra note 1.
[10] The Plaintiffs also request that this Court address the "reasonable reliance" jury instruction issue, which they raised in their motion for new trial. However, because that issue is outside the scope of the conflict issue, we decline to address it. See, e.g., Ashell v. State, 715 So.2d 258, 258 (Fla.1998). Further, we consider the Plaintiffs' claim that the verdict was against the manifest weight of the evidence only to the extent necessary to analyze whether the closing argument comments being challenged as improper warrant a new trial against Hornsby and Robotic Systems II.
[11] As noted above, the trial court in Baggett denied a motion for new trial filed by the defendant. See 124 Fla. at 706, 169 So. at 375. This Court's opinion in Baggett did not identify the specific issues raised in the defendant's motion for new trial, noting only that the motion "embod[ied] some of the grounds found in the assignment of errors, which grounds will be taken up in detail on disposing of the questions presented." See id. However, while addressing the propriety of the statements made by plaintiff's counsel during closing argument, the Baggett Court noted that plaintiff's counsel "filed an affidavit in his motion for new trial which attempted in some measure to deny the facts as set out in the bill of exceptions as to what actually took place at the trial." See Baggett, 124 Fla. at 716, 169 So. at 378. This language indicates that at least one of the issues raised in the defendant's motion for new trial concerned the propriety of the statements made by plaintiff's counsel during closing argument.
[12] While Akin does not specifically state that the trial court denied the defendant's motion for new trial, see 86 Fla. at 570-71, 98 So. at 612, it is clear that the court did so given the defendant's appeal to this Court.
[13] The Second District concluded in Hagan v. Sun Bank of Mid-Florida, N.A., 666 So.2d 580, 585-86 (Fla. 2d DCA 1996), that the defendant in Baggett received a new trial based on plaintiff's counsel's improper, but unobjected-to, closing argument. Similarly, the Fourth District's decision in Carlton v. Johns, 194 So.2d 670, 674 (Fla. 4th DCA 1967), may be read as concluding that this Court granted a new trial in Baggett based on plaintiff's counsel's improper, but unobjected-to, closing argument. Regardless of the proper Baggett interpretation, based upon an analysis of Akin, the standard for relief is exceedingly high.
[14] The underlying facts in Strickland are fully set forth in this Court's earlier decision in that case, a decision that was reversed by the United States Supreme Court on an issue of federal law. See Seaboard Air Line R.R. v. Strickland, 80 So.2d 914, 915-17 (Fla.), rev'd, 350 U.S. 893, 76 S.Ct. 157, 100 L.Ed. 786 (1955). The Strickland case that we now analyze came to this Court upon remand from the decision of the U.S. Supreme Court. See Strickland, 88 So.2d at 520.
[15] Neither of this Court's Strickland opinions indicate whether the defendant included objectionable statements as a basis for a new trial.
[16] As stated above, the Strickland Court previously had determined that the trial court erred in admitting the letters into evidence. See 88 So.2d at 521. Thus, the use of the word "admissible" here must mean "admitted."
[17] We note that Tyus was a four-to-three decision, with Justice O'Connell authoring the dissenting opinion. See Tyus v. Apalachicola N. R.R. Co., 130 So.2d 580, 588-96 (Fla.1961) (O'Connell, J., dissenting in part, joined by Roberts and Drew, JJ.). While the three dissenting justices agreed with the majority's ruling on the sufficiency of the evidence issue, see id. at 588, they disagreed with the majority's decision on the closing argument issue. See id. at 588-96. The majority apparently alleviated one of the main concerns expressed in the dissenting opinion by clarifying the meaning of the term "pervades" as used in the Strickland standard. See id. at 587, 588-91. However, the dissenting justices set forth the numerous improper statements made by plaintiff's counsel during closing argument, some of which were objected to and some of which were not, and disagreed with the majority that such statements did not warrant reversal for a new trial. See id. at 591-96.
[18] It should be noted, however, that this Court has not allowed a trial judge's breach of duty in the context of improper, but unobjected-to, closing argument to form an independent basis for appellate review. See Baggett, 124 Fla. at 717, 169 So. at 379 ("A verdict will not be set aside by an appellate court because of [improper] remarks or because of any omission of the judge to perform his duty in the matter, unless objection be made at the time of their utterance.").
[19] We do not attempt to discuss decisions from every state and federal court, but instead attempt to provide an overview of the various approaches taken by courts in other jurisdictions.
[20] As we noted above, however, the parties challenging the improper, but unobjected-to, closing arguments in Baggett, Tyus. and Dupont first challenged such arguments by filing a motion for new trial in the trial court, and were therefore not challenging such arguments for the first time on appeal.
[21] We disapprove King v. National Security Fire & Casualty Co., 656 So.2d 1335, 1337 (Fla. 4th DCA 1995), to the extent that it stands for the proposition that counsel may not use the terms "liar" or "lied" regarding a witness when there is record support to question the witness's credibility.
[22] We disapprove Tremblay v. Santa Rosa County, 688 So.2d 985, 988 (Fla. 1st DCA 1997), and Bullock v. Branch, 130 So.2d 74, 77 (Fla. 1st DCA 1961), to the extent that those decisions stand for the proposition that a complaining party need not establish the harmfulness of improper, but unobjected-to, closing argument in order to be granted a new trial based on such argument.
[23] Depending upon the extent to which the improper argument affected the trial, the trial court may award a new trial as to liability, damages, or both.
[24] We disapprove Goutis, 699 So.2d at 760; Tremblay, 688 So.2d at 987; Hagan, 666 So.2d at 587; Eichelkraut v. Kash N' Karry Food Stores, Inc., 644 So.2d 90, 92 (Fla. 2d DCA 1994); Wasden, 474 So.2d at 829; and Sears Roebuck & Co. v. Jackson, 433 So.2d 1319, 1322 (Fla. 3d DCA 1983), to the extent that those decisions stand for the proposition that a trial court's grant of a new trial based on unobjected-to closing argument should be subject to a de novo standard of review on appeal. The nature of the elements to be examined and the impact upon a trial are issues that are more properly resolved at the trial level, subject to extremely limited review on appeal.
[25] In Canakaris v. Canakaris, 382 So.2d 1197, 1203 (Fla.1980), this Court set forth the standard of review to be employed by an appellate court in reviewing a discretionary act of the trail judge:

In reviewing a true discretionary act, the appellate court must fully recognize the superior vantage point of the trial judge and should apply the "reasonableness" test to determine whether the trial judge abused his discretion. If reasonable men could differ as to the propriety of the action taken by the trial court, then the action is not unreasonable and there can be no finding of an abuse of discretion. The discretionary ruling of the trial judge should be disturbed only when his decision fails to satisfy this test of reasonableness.
[26] The actual motion for new trial filed by the Plaintiffs did not identify any of the allegedly improper closing argument made by counsel for UTC/UTOS, but instead stated, "The jury's verdict was tainted by inflammatory and unfairly prejudicial closing argument of counsel for UTC/UTOS which permeated the entire proceeding and amounted to fundamental error depriving the Plaintiffs of a fair trial." The Plaintiffs' memorandum of law in support of their motion for new trial did, however, specifically identify various portions of opposing counsel's allegedly improper closing argument, and the Plaintiffs' initial brief filed in this Court closely tracks the memorandum of law filed in the trial court. In fact, all of the allegedly improper closing argument identified in the memorandum of law is identified in the Plaintiffs' initial brief as a basis for a new trial.
[27] This four-part test, which all but closes the door on unobjected-to closing argument, requires that the challenged argument be: (1) improper; (2) harmful, which the majority defines as "be[ing] of such a nature that it reaches into the validity of the trial itself to the extent that the verdict reached could not have been obtained but for such comments"; (3) incurable; and (4) such that it "so damaged the fairness of the trial that the public's interest in our system of justice requires a new trial." Majority op. at 1028-1030.
[28] Many of the opinions of the other courts that have embraced this doctrine are discussed extensively in the majority's opinion. See majority op. at 1024-1025. Accordingly, I question the accuracy of the Fourth District's statement that "[s]o far as our research indicates, no other courts in this country allow improper argument to be raised for the first time on appeal in civil cases." Murphy v. Int'l Robotics Sys., Inc., 710 So.2d 587, 591 (Fla. 4th DCA 1998).
[29] See, e.g., R. Regulating Fla. Bar 4-3.4(c) ("A lawyer shall not ... knowingly disobey an obligation under the rules of a tribunal except for an open refusal based on an assertion that no valid obligation exists."); id. 4-3.4(e) ("A lawyer shall not ... in trial, allude to any matter that the lawyer does not reasonably believe is relevant or that will not be supported by admissible evidence ...."); id. 4-3.5(a) ("A lawyer shall not seek to influence a judge, juror, prospective juror, or other decision maker except as permitted by law or the rules of court.").
[30] In Hagan, Judge Altenbernd set forth a two-part analysis, which provides:

First, the trial court must determine whether the error was so pervasive, inflammatory, and prejudicial as to preclude the jury's rational consideration of the case.... Second, the trial court must decide whether the error was fundamental. In essence, this is a legal decision that the error was so extreme that it could not be corrected by an instruction if an objection had been lodged, and that it so damaged the fairness of the trial that the public's interest in our system of justice justifies a new trial even when no lawyer took the steps necessary to give a party the right to demand a new trial.
666 So.2d at 586. Judge Cobb objected to this two-step analysis as "a constriction of the authority of a trial judge to deal with the problem of attorney misconduct in closing argument." Fravel, 727 So.2d at 1039 (Cobb, J. concurring specially).
[31] In Sacred Heart Hosp. v. Stone, 650 So.2d 676, 679 (Fla. 1st DCA 1995), a case in which the court reversed for a new trial based on improper closing argument, the appellant cited to many instances of counsel's use of the word "ridiculous" during closing argument.
[32] Further, if the attorney has made objections to some of the closing argument remarks, which have been overruled, the fact that all of the objectionable remarks have not been preserved by subsequent objection does not preclude the appellate court from reviewing the cumulative effect of the objected-to and unobjected-to remarks. I also share Judge Sharp's concern that even when there has been proper objection, the appellate court standard for reversal for a new trial may be unreasonably high. See Fravel, 727 So.2d at 1039-40 (Sharp, J., dissenting).