957 So.2d 1242 (2007)
MERCURY INSURANCE COMPANY OF FLORIDA, Appellant,
v.
Victor A. MORETA, Appellee.
No. 2D05-5945.
District Court of Appeal of Florida, Second District.
May 2, 2007.
Rehearing Denied June 13, 2007.
*1244 Elizabeth K. Russo and Jonathan L. Gaines of Russo Appellate Firm, P.A., Miami, and Law Offices of Thomas E. O'Hara, Clearwater, for Appellant.
*1245 Nancy A. Lauten and George A. Vaka of Vaka, Larson & Johnson, P.L., Tampa, for Appellee.
WALLACE, Judge.
Mercury Insurance Company of Florida appeals an adverse judgment entered against it on Victor A. Moreta's claim for uninsured/underinsured motorist (UM) benefits. Mercury raises three issues concerning the trial court's denial of its motion for new trial. All of the issues raised by Mercury are without merit, and we affirm the judgment. However, we write to address Mercury's point concerning the repeated and extensive remarks made by Mr. Moreta's counsel during closing argument about Mercury's alleged litigation practices and its alleged attempt to shirk its contractual obligations to Mr. Moreta.[1] According to Mercury, these remarks were so exceptionally objectionable that they fall within the extremely limited exception to the rule requiring a contemporaneous objection to preserve a claim of error based on improper closing argument. We agree with Mercury that opposing counsel's remarks were improper, but we hold that the trial court did not abuse its discretion in denying Mercury's motion for new trial when Mercury made no contemporaneous objection to the improper remarks.

I. THE FACTUAL BACKGROUND
A. The Collision
On March 30, 2002, Mr. Moreta was involved in an automobile accident at the intersection of Dale Mabry Highway and West Lambright Street in Tampa. Joseph A. Colon was the driver of the other vehicle involved in the accident. Mr. Colon ran a red light, and Mr. Moreta's vehicle hit Mr. Colon's vehicle in a "T-bone" type collision.
B. Mr. Moreta's Subsequent Medical Treatment
Mr. Moreta did not immediately seek medical attention after the accident. Instead, he went home. Mr. Moreta later sought treatment for back pain that he attributed to the force of the collision. Approximately two years after the accident, a neurologist diagnosed Mr. Moreta as having a herniated disc at the L5-S1 level and a bulge at the L4-5 level. In December 2004, a surgeon performed a left L4-5 percutaneous endoscopic discectomy on Mr. Moreta.
C. The Insurance Policy
When the accident occurred, Mr. Moreta's wife had a private passenger automobile policy with Mercury. Mr. Moreta was listed as one of the "DRIVERS" on the policy. The policy terms pertinent to UM coverage provided, in pertinent part:

We will pay for damages, other than punitive or exemplary damages, which an insured person is entitled to recover from the owner or operator of an uninsured car because of bodily injury:

1. sustained by an insured person;

2. caused by accident; and
3. arising out of the ownership, maintenance or use of an uninsured car.

The bodily injury must be a serious injury as described in Section 627.737(2) of the Florida Motor Vehicle No-Fault Law before we will pay for damages consisting of pain, suffering, mental anguish, or inconvenience.
Mr. Moreta qualified as "an insured person" within the meaning of the policy. Mrs. Moreta's policy with Mercury provided for non-stacked UM coverage with a policy limit of $25,000 per person and $50,000 per accident.
*1246 D. The Lawsuit and the Trial
In February 2004, Mr. Moreta filed a two-count complaint against Mr. Colon and Mercury. Count one of the complaint was for negligence against Mr. Colon. In the second count, Mr. Moreta sought to recover UM benefits from Mercury. Mr. Moreta alleged that Mr. Colon was an underinsured motorist within the meaning of the policy of insurance issued by Mercury. One week before trial, Mr. Moreta took a voluntary dismissal of his claim against Mr. Colon.
In September 2005, the case went to trial before a jury on Mr. Moreta's UM claim. At trial, Mercury stipulated that Mr. Colon had been negligent and that Mr. Moreta had not been comparatively negligent. Thus the issues to be decided by the jury were (1) whether Mr. Moreta had sustained an injury as a result of the collision; (2) if so, whether the injury was permanent within a reasonable degree of medical probability or involved the significant and permanent loss of an important bodily function; and (3) the amount of the damages, if any, to which Mr. Moreta was entitled. In the absence of any issues concerning responsibility for the collision, the trial developed into a battle of expert medical witnesses. Mr. Moreta's experts testified that his back problems and surgery resulted from the collision. The surgeon who had operated on Mr. Moreta also testified that Mr. Moreta would probably require further surgerya fusion at the L5-S1 level. In response, Mercury's expert testified that whatever injuries Mr. Moreta had sustained in the accident were resolved within a few months after the incident. The defense expert opined that the disc problems in Mr. Moreta's back were not caused by the collision. Instead, Mercury's expert attributed Mr. Moreta's back problems to anotheralbeit unknowncause that occurred after the original problems had been resolved.
At the conclusion of the evidence, the trial court directed a verdict in favor of Mr. Moreta on the issue that the accident had caused an injury. The trial court also ruled that Mr. Moreta was entitled to recover his accrued medical expenses through July 17, 2003. The trial court denied Mr. Moreta's motion for a directed verdict on the issues of permanency and the significant and permanent loss of an important bodily function. Based on Mercury's stipulation on the issue of negligence and on the trial court's grant of a partial directed verdict, the matters submitted to the jury were limited to the medical issues and damages. With this background, we now turn to the remarks made by opposing counsel in his closing argument.

II. OPPOSING COUNSEL'S REMARKS MADE DURING CLOSING ARGUMENT
Mercury's complaints about opposing counsel's closing argument focus on his repeated comments about Mercury's alleged litigation practices and its alleged attempt to shirk its contractual obligation to Mr. Moreta. Initially, we note that Mercury's counsel first raised this topic with the trial court after jury selection was completed and before counsel began their opening statements:
[MERCURY'S COUNSEL]: Judge, just very briefly. I provided the Court and [Mr. Moreta's counsel] has decided to follow a case of State Farm versus Welburn[[2]] with the argument that the *1247 UM carrier was supposed to be there for the insured at a certain time.
THE COURT: Well, I think we talked about that earlier, and I think what we decided was there was some language that could be said but maybe not to the extent from which you were suggesting.
[MERCURY'S COUNSEL]: Okay.
THE COURT: Is thatwhen I read that case, it seemed to say that you can't use the words ["]they should have been there for you["] and try to invoke sympathy for the jurors, but I think he can illustrate the relationship between the two and that was his insurance company. There's no problem with that. That's perfectly fair game.
But to sit there and open his heart and say, oh, you know, they left him in the street alone in the rain or something, they left him out hanging, maybe along those lines. Is that kind of what you're saying?
[MERCURY'S COUNSEL]: Right. I just want to make sure that we're going to follow that other case and
THE COURT: I will allow that there's a nexus, a relationship there, a business relationship, and obviously you can talk about what the contract says, right? Because that's a fact. The contract says that if I get uninsured, whatever the contract says, I think that's a fact. But if he sits there and pours his heart out and says, oh, I left them in the cold or something.
I understand your point. If I start seeing [Mr. Moreta's counsel] going down that emotional view with the jurors for sympathy, then I can stop that. But, again, a business factual basis I don't think that case stops a relationship, a business contract nexus. Does It? I don't think it does.
[MERCURY'S COUNSEL]: No.
[MR. MORETA'S COUNSEL]: Plus this is opening anyway. I don't intend to argue that.
THE COURT: But in general, just in general, the nexus is okay, but if I see you opening your heartbut I don't think you'll do that. But, anyway, if that happens, object, and we'll talk about it. Okay?

[MR. MORETA'S COUNSEL]: Some people say I don't have a heart.
(Emphasis added.) With that, the trial court and the attorneys began a discussion of unrelated matters.
We note from the foregoing colloquy between the trial court and counsel that the trial court established clear ground rules governing opposing counsel's remarks concerning the relationship between Mr. Moreta and Mercury. Opposing counsel was to limit his remarks about Mercury to the "business contract nexus" between the parties and to avoid appeals based on sympathy. If Mr. Moreta's counsel exceeded these limitations and began "opening his heart," then Mercury's counsel was to object so that the trial court could rule on the propriety of any comments made. Mercury's counsel did not demur or express any misunderstanding about the ground rules for argument that the conscientious trial judge announced in advance.
Unfortunately, once closing arguments began, both counsel appear to have either forgotten or ignored the ground rules for argument established at the beginning of the trial. After a few preliminary remarks, opposing counsel launched his closing argument with an attack on Mercury's alleged claims-handling practices and litigation tactics. Using an analogy drawn from his own college art history course, Mr. Moreta's counsel argued that there *1248 were certain recurring themes one could identify in every case where Mercury was the insurance carrier:
[I]n college I took an art history course, actually, and I'm not here to tell you that I'm an art expert because I'm not. But I'll tell you that what I learned from that the [sic] course is, is that if one studies an artist, you can tell by their style if that painting oftentimes [sic] was done by him or her. For example, there was an artist long ago by the name of El Greco, Spanish for the word ["]The Greek.["] He was born in Greece and he spent a lot of his time in Spain. And you could tell me [sic] after a while, that his paintings were often made of icons, and they had elongated figures, they had a kind of realfigures, and long fingers, and you could tell that that was an El Greco work. And so the subject of the painting may be different but there was kind of a recurring theme or recurring motif throughout his paintings.
For example, there was another artist by the name of Rubens, who was Flemish, studied in Venice, and his paintings were distinct for the way he used shimmering light and the way he used bright colors; and, once again, you could recognize his works because of this recurring theme, his recurring motif throughout his works.
Now, the recurring theme in a Mercury insurance case is to blame anything and everything but the accident for the injury. And when that doesn't work, they say, "We don't know what it was but it just wasn't the motor vehicle accident that caused these problems."
Question posed, "If it wasn't the motor vehicle accident, what was it?" "We don't know but it must have been something."
"Can you point to an event?" Was the question. "No, we can't."
A little later, Mr. Moreta's counsel asserted that Mercury's conduct was "worse" because the company was mistreating its own insured:
[T]rial by jury should be a search for the truth and not a win at all costs. What's worse is this is their own insured.
Now, even though this is an adversarial relationship, technically, the reality is that Mr. Moreta's insured by Mercury. And you gotone must remember that when one points the finger at somebody else, three fingers are pointing back to themselves. I suggest to you that three fingers are pointing back to themselves in this case for the way they've treated him.
Next, opposing counsel told the jury what his fourteen-year old son would have said about Mercury's alleged mistreatment of Mr. Moreta:
I have a 14-year-old son, he plays sports, he is an athlete, and if he were here, he'd say, "Come on, dog, just give it up. Just give it up." And they're not giving it up.
After discussing the medical issues in the case, opposing counsel made a series of remarks suggesting that Mercury owed Mr. Moreta a "debt." Mercury's defense of the UM claimopposing counsel claimedwas an attempt by the company to shirk its contractual responsibility to Mr. Moreta. Expanding on this theme, opposing counsel called on the jury to exercise its unlimited power to right the wrong:
As I contended from the very beginning, a debt was created on March 30th, 2002, a debt was created by Mercury Insurance Company, and we're going to ask you to right a wrong that has occurred.
. . . .
I believe that there are no coincidences in life, that things happen for a reason; and that you're on this jury for *1249 a reason, that you're on this jury because you're going to right that wrong, and because you're going to use your immense power as a juror to award restitution.
. . . .
Now, the lack of accepting responsibility is one of the biggest problems that we face in our society today . . . and that people don't want to spent [sic] responsibilities for their actions. And, in fact, corporations are fictional people.
And there's a book written, actually, it's called, I Learned Everything I Needed to Know in Kindergarten.[[3]] Some of you may be familiar with it. It talks about play well with others, and basically what they're saying is these are things that you can use as an adult: Play well with others, something we can use; clean up after your own mess, that's something we can use; and be responsible for your actions. We're asking Mercury to read that book and not try to avoid their responsibility by coming in here and asking you to award less than [the] full amount of damages.
On rebuttal, opposing counsel concluded his argument by reiterating his claim that Mercury was attempting to evade its contractual obligation to Mr. Moreta:
[Mr. Moreta] has a contract with Mercury. They're trying to avoid their responsibility. He has a relationship with Mercury. It's a contractual relationship, and we're asking them to live up to their responsibility under the contract. We're asking for the full amount of this compensation in the amount of $1.5 million.
. . . .
. . . One thing we really do agree on is this is wrong, it's wrong what they're doing to their own insured. It ain't right. They have a handshake agreement, that's what a contract is, handshake, they have a contract and they're not living up to the terms and conditions of the contract, and we ask that you hold them to it.
Thank you.
Mercury's counsel did not object to any of the foregoing remarks. Even at the conclusion of opposing counsel's rebuttal argument, Mercury's counsel made no objection, did not request any curative instructions, and made no motion for a mistrial.

III. THE JURY'S VERDICT AND POST TRIAL MATTERS
In his closing argument, opposing counsel asked the jury to award Mr. Moreta damages in the amount of $1.5 million. The jury returned a verdict in favor of Mr. Moreta but awarded a lesser amount $800,000. The jury's award was composed of the following elements: $30,200 for past medical expenses, $325,000 for future medical expenses, $50,000 for past pain and suffering, and $394,800 for future pain and suffering.
After the entry of the verdict, Mercury served a motion for new trial that raised several grounds. With respect to the closing argument, Mercury asserted in its motion that fundamental error occurred when opposing counsel argued that "Mercury had engaged in a pattern of wrongfully refusing to pay claims when due." The trial court denied the motion for new trial. The trial court also entered judgment in favor of Mr. Moreta and against Mercury for $25,000the amount of the UM policy limit.

*1250 IV. DISCUSSION
A. Introduction
A trial court may grant a new trial based on improper closing argument by counsel. See Allison Transmission, Inc. v. J.R. Sailing, Inc., 926 So.2d 404, 407 (Fla. 2d DCA 2006) (citing Carlton v. Johns, 194 So.2d 670 (Fla. 4th DCA 1967)). "If the issue of an opponent's improper argument has been properly preserved by objection and motion for mistrial, the trial court should grant a new trial if the argument was `so highly prejudicial and inflammatory that it denied the opposing party its right to a fair trial.'" Engle v. Liggett Group, Inc., 945 So.2d 1246, 1271 (Fla. 2006) (quoting Tanner v. Beck, 907 So.2d 1190, 1196 (Fla. 3d DCA 2005)).
A different standard for granting a new trial based on improper argument applies where there is no contemporaneous objection and motion for mistrial. In Murphy v. International Robotic Systems, Inc., 766 So.2d 1010 (Fla.2000), the Supreme Court of Florida announced a four-part test to be applied in assessing motions for new trial in civil cases based on claims of improper but unobjected-to remarks made during closing argument. As a preliminary matter, in order to preserve the issue for appellate review, the complaining party must at least challenge the improper but unobjected-to argument in the trial court by way of a motion for new trial. Id. at 1027. To prevail on such a motion, the complaining party must establish that the argument was (1) improper, (2) harmful, (3) incurable, and (4) so damaging to the fairness of the trial that the public's interest in our system of justice requires a new trial. Id. at 1031; Platz v. Auto Recycling & Repair, Inc., 795 So.2d 1025, 1027 (Fla. 2d DCA 2001). If the trial court finds that these four criteria have been met, "it must enter an order granting a new trial specifically identifying both the improper arguments of counsel and the actions of the jury resulting from those arguments." Id. (citing Murphy, 766 So.2d at 1030). An appellate court applies an abuse of discretion standard in reviewing a trial court's order granting or denying a new trial based on unobjected-to closing argument. Murphy, 766 So.2d at 1030-31.
The Murphy court recognized that very few cases would meet its stringent four-part test for obtaining a new trial based on improper but unobjected-to closing argument. Such cases will be rare exceptions to the rule requiring a contemporaneous objection. Indeed, the Murphy court described the rule it announced as "an escape valve with a very narrowly defined parameter and of extremely limited application." Id. at 1026. This court has previously characterized Murphy's four-part test as "extra-ordinarily demanding." Platz, 795 So.2d at 1027. Noting the "shift in dynamics occasioned by" Murphy, the First District summarized Murphy's lesson to trial counsel as follows: "[A] remedy will almost always be tied to a contemporaneous objection." Bocher v. Glass, 874 So.2d 701, 704 (Fla. 1st DCA 2004). With these limitations in mind, we turn now to an examination of Mercury's argument that opposing counsel's remarks during closing argument met the four-part test of Murphy.
B. The Application of Murphy's Four-Part Test
Initially, we observe that Mercury's counsel did not make contemporaneous objections to any of the remarks made by opposing counsel that are challenged on this appeal. Moreover, Mercury did not request a curative instruction or move for a mistrial at the conclusion of opposing counsel's argument. However, Mercury did serve a motion for new trial based on the unobjected-to remarks, thereby preserving the issue for review. Our task is *1251 to determine whether the trial court abused its discretion in denying Mercury's motion for new trial based on Murphy's four-part test.
1. The Challenged Argument Must Be Improper
In applying the four-part test of Murphy, we first look to whether opposing counsel's remarks were improper. Upon reviewing the challenged remarks in context, we conclude that they were improper for multiple reasons. First, opposing counsel's remarks violated the trial court's ruling announced at the beginning of the trial about the scope of proper comment on the relationship between Mr. Moreta and Mercury. Opposing counsel's remarks went far beyond a description of the "business contract nexus" that the trial court had declared was permissible. Instead, opposing counsel did precisely what the trial court had ruled he could not dohe "poured out his heart" and accused Mercury of leaving Mr. Moreta "out hanging." At least where prejudice is shown, comments during closing argument that violate a pretrial order may warrant the granting of a new trial. See USAA Cas. Ins. Co. v. Howell, 901 So.2d 876, 879 (Fla. 4th DCA 2005); Leyva v. Samess, 732 So.2d 1118, 1121 (Fla. 4th DCA 1999).
Second, opposing counsel's criticism of Mercury's alleged litigation tactics and practices was not based on matters in evidence. Using the analogy to the paintings of El Greco and Rubens, opposing counsel described practices that he claimed one could identify in every case where Mercury was the insurance carrier. Because there was no evidence before the trial court to support these claims, it was improper for counsel to make them. See Carnival Cruise Lines, Inc. v. Rosania, 546 So.2d 736, 737-38 (Fla. 3d DCA 1989). Moreover, Mercury's alleged practices in other cases were irrelevant to any issue to be determined by the jury.
Third, opposing counsel's rebuke of Mercury for failing to pay UM benefits to Mr. Moreta and thereby breaching its alleged contractual obligations to him is the same type of argument that was condemned by the Third District in State Farm Mutual Automobile Insurance Co. v. Revuelta, 901 So.2d 377, 380 (Fla. 3d DCA 2005). Mr. Moreta's action against Mercury was for the recovery of UM benefits, not an action for breach of contract or for bad faith. Contrary to opposing counsel's assumption, an action to recover UM benefits is not an action for the breach of a contract of insurance. An action to recover UM benefits is based on a contract, but "it has its underpinnings in tort liability." Auto-Owners Ins. Co. v. Dewberry, 383 So.2d 1109, 1109 (Fla. 1st DCA 1980); see also Geico Gen. Ins. Co. v. Graci, 849 So.2d 1196, 1199 (Fla. 4th DCA 2003) (stating that an action on a contract to recover UM benefits "is not an action for a breach of that contract; rather, it is an action filed pursuant to the contract").
In fact, the basis of Mr. Moreta's action against Mercury was the same as the basis of the action that he had filed against Mr. Colon (the underinsured third party tortfeasor) to recover damages for bodily injuries. Graci, 849 So.2d at 1199 (citing State Farm Mut. Auto. Ins. Co. v. Kilbreath, 419 So.2d 632 (Fla.1982)). Under the UM, policy purchased by Mrs. Moreta, Mercury was obligated to pay only those damages "which an insured person is entitled to recover from the owner or operator of an uninsured car." Thus Mercury stood in the shoes of the underinsured motorist and had the right to raise all substantive defenses to Mr. Moreta's action that the underinsured motorist could have raised. See Allstate Ins. Co. v. Boynton, 486 So.2d *1252 552, 556 (Fla.1986). For these reasons, it was improper for opposing counsel to argue to the jury that Mercury had "breached" the contract or that it was shirking its responsibilities to Mr. Moreta. See Howell, 901 So.2d at 879; Revuelta, 901 So.2d at 380.
Finally, it was improper for counsel to tell the jury what his fourteen-year-old son would have thought about Mercury's defense of the case. Counsel's son was not a witness who had testified at trial. If counsel's son had testified, his opinion about Mercury's litigation tactics would not have been admissible in evidence for a variety reasons. More important, irrelevant stories and information about counsel's family have no place in closing argument. See Bocher, 874 So.2d at 703 (describing trial court ruling sustaining objection to plaintiffs' counsel's attempt to tell a story about him and his grandfather walking in the Florida woods when counsel was a child); Muhammad v. Toys "R" Us, Inc., 668 So.2d 254, 258 (Fla. 1st DCA 1996) (observing that "irrelevant familial rhetoric must not be condoned"); Metro. Dade County v. Cifuentes, 473 So.2d 297, 298 (Fla. 3d DCA 1985) (holding that closing argument by plaintiff's counsel in a wrongful death action about telling his wife the previous night for the first time in a long time that he loved her and about his fear of living if someone he loved died was improper); cf. Airport Rent-A-Car, Inc. v. Lewis, 701 So.2d 893, 896-97 (Fla. 4th DCA 1997) (noting the impropriety of plaintiff's counsel's remarks during his cross-examination of defense expert that, "My daddy was a preacher, so I know what the truth is. . . ."). In this case, opposing counsel's discussion of his son's hypothetical opinion was nothing more than a transparent attempt to curry favor with the jury and to further prejudice it against Mercury.
2. The Argument Must Be Harmful
Under the second part of the Murphy test, the complaining party must establish that the challenged argument was harmful. Murphy, 766 So.2d at 1029-30. The harmfulness requirement serves as a reminder to trial courts and appellate courts that the remedy of a new trial is not a tool to punish the misconduct of lawyers who transgress the proper bounds of closing argument. Id. at 1029. Instead, harmfulness "carries a requirement that the comments be so highly prejudicial and of such collective impact as to gravely impair a fair consideration and determination of the case by the jury." Id. The bar of the harmfulness requirement is set quite high. "[T]he improper closing argument comments must be of such a nature that it reaches into the validity of the trial itself to the extent that the verdict reached could not have been obtained but for such comments." Id. at 1030.
The second part of the Murphy test is more difficult to apply in this case than the first part of the test. Opposing counsel's remarks were unquestionably improper. However, the question of the harmfulness of those remarks under Murphy's standard is not as easy to determine. On the one hand, opposing counsel depicted Mercury as a heartless corporate giant that had broken faith with Mr. Moreta. According to opposing counsel, Mercury's standard litigation tactic in UM cases is to raise flimsy excuses to avoid paying its insuredssuch as Mr. Moretathe just compensation to which they are contractually entitled. Opposing counsel's incessant drumbeat of criticism was calculated to elicit sympathy for Mr. Moreta from the members of the jury and to persuade them to draw inferences against Mercury that had no basis in the evidence presented at trial or in the applicable law. Moreover, Mercury presented credible evidence at *1253 trial from which the jury might have concluded that Mr. Moreta's continuing back problems and subsequent surgery were entirely unrelated to the March 2002 accident. In light of these factors, we are inclined to believe that opposing counsel's remarks had at least some impact on the jury that was prejudicial to Mercury in the defense of Mr. Moreta's UM claim.
On the other hand, Mr. Moreta presented substantial evidence that linked his continuing back problems and subsequent surgery to the accident. After reviewing the record, we think the jury probably found Mr. Moreta's expert witnesses more credible than the defense expert. And although the jury awarded Mr. Moreta a substantial sum, the $800,000 verdict was only a little more than one-half of the $1.5 million that opposing counsel had requested in his closing argument. Cf. Howell, 901 So.2d at 879 (finding that counsel's remarks did not meet Murphy's harmfulness requirement where plaintiff sought damages in excess of $260,000 and the jury awarded $300,000, a slightly larger amount). Under these circumstances, we are unable to say that the jury would not have reached the verdict that it did but for opposing counsel's remarks. Thus Mercury has failed to establish harmthe second part of the Murphy test.
3. The Argument Must Be Incurable
We move now to the third part of the Murphy testthat the challenged argument was incurable. In order to establish Murphy's third prong, "a complaining party must establish that even if the trial court had sustained a timely objection to the improper argument and instructed the jury to disregard the improper argument, such curative measures could not have eliminated the probability that the unobjected-to argument resulted in an improper verdict." Murphy, 766 So.2d at 1030. The Murphy court noted that "it will be extremely difficult for a complaining party to establish that the unobjected-to argument is incurable." Id.
The challenged remarks by opposing counsel in this case were not only highly improper, they were also repetitive and extensive. Nevertheless, they were not incurable. Generally speaking, improper references to insurance matters in closing argument may be cured by an appropriate instruction to the jury from the trial court. See S. Motor Co. of Dade County v. Accountable Constr. Co., 707 So.2d 909, 911 (Fla. 3d DCA 1998); Allstate Ins. Co. v. Wood, 535 So.2d 699, 700 (Fla. 1st DCA 1988). In several Florida cases, comments similar to those expressed by opposing counsel in this case have been deemed to be curable by an appropriate instruction. See Howell, 901 So.2d at 879-80; Allstate Ins. Co. v. Buzdigian, 776 So.2d 1104, 1104 (Fla. 5th DCA 2001); Wood, 535 So.2d at 700. In this case, the trial court instructed Mercury's counsel at the beginning of the trial that if Mr. Moreta's counsel began "opening his heart," then Mercury's counsel was to object. Accordingly, if Mercury's counsel had objected the first time Mr. Moreta's counsel made the offending remarks, the trial court could have sustained the objection, given a curative instruction to the jury, and admonished opposing counsel if he again engaged in improper argument. See Buzdigian, 776 So.2d at 1104 (describing how counsel's contemporaneous objection to improper closing argument elicited an effective response from the trial court that cured any error). And by objecting to the first offending comment, Mercury could have deterred the repetition of the improper remarks that resulted in the "cumulative effect" about which it now complains. Thus Mercury has also failed to establish incurabilitythe third part of the Murphy test.
*1254 4. Consideration of the Public's Interest in our System of Justice
Under Murphy, the analysis does not proceed to the last part of the four-part test unless the complaining party establishes that the argument being challenged is improper, harmful, and incurable. See Murphy, 766 So.2d at 1030; Telemundo Network, Inc. v. Spanish Television Servs., Inc., 812 So.2d 461, 467 (Fla. 3d DCA 2002) (Sorondo, J., specially concurring). Since Mercury has not established that the improper argument was both harmful and incurable, we need not reach the fourth part of the Murphy test.

V. CONCLUSION
For these reasons, we conclude that the trial court did not abuse its discretion in concluding that Mercury did not establish its entitlement to a new trial under the test of Murphy. Accordingly, we affirm the trial court's judgment.
Affirmed.
CASANUEVA and STRINGER, JJ., Concur.
NOTES
[1] Mr. Moreta's counsel on this appeal did not represent him in the trial court.
[2] Mercury's counsel did not provide a citation for this case, and we have not been able to find one. Perhaps the case Mercury's counsel referred to is State Farm Mutual Automobile Insurance Co. v. Revuelta, 901 So.2d 377 (Fla. 3d DCA 2005). The Third District issued its opinion in Revuelta approximately four months before Mr. Moreta's case went to trial.
[3] We presume that the book referred to here is Robert Fulghum, All I Really Need to Know I Learned in Kindergarten: Uncommon Thoughts on Common Things (Villard Books 1988).