COHEN, J.
Appellants, Health First, Inc. (“Health First”) and David S. Ori (“Ori”), appeal from a final judgment in excess of $2,000,000 entered against them in a personal injury case in favor of Cheryl L. Cataldo (“Cataldo”). They challenge Ca-taldo’s withdrawal of claims on the eve of trial, Cataldo’s attorney’s closing argument at trial, and attorney’s fees awarded pursuant to offers of judgment.

BACKGROUND

In 2005, Cataldo was driving her Toyota Corolla southbound on AlA in Indialantic, Florida. As she slowed to turn right, her vehicle was rear-ended on the left rear bumper by a Ford E-350[1] owned by Health First and driven by its employee, Ori. Cataldo claimed that the accident •caused her head to snap forward and back, and caused what she phrased as an “explosion” and “starburst feeling” in the top and back of her head. Ori estimated he was going five to ten miles an hour when the accident occurred, yet admitted to pushing Cataldo’s car ten feet into the intersection.
Cataldo declined transport immediately following the accident. She went to the emergency room later that day, complaining of neck pain, and was diagnosed with a cervical strain. In February 2006, some five months after the accident, she underwent surgery for three herniated discs in her cervical spine. Prior to the accident, the forty-two-year-old Cataldo worked out on a regular basis and participated in triathlons and other races. She was employed as a dental hygienist and worked part-time as a bartender and waitress. She has not worked since the accident and continues to treat for medical and psychological problems allegedly caused by the crash.
On May 30, 2007, Cataldo filed suit against Health First and Ori (collectively “Defendants”), to recover damages for the injuries she sustained in the crash. Health First admitted that Ori was an employee acting within the course and scope of his employment at the time of the *862 accident. Liability was also admitted and the case was tried on the issue of damages.
Shortly before trial, Cataldo informed the court that she was withdrawing her claim for damages associated with her brain and dental injuries. These claims had been areas of particular dispute, as defense counsel believed Cataldo had been caught in lies during discovery that impacted these claims.[2] Upon dropping the claims, Cataldo contemporaneously moved to prohibit Defendants from introducing any evidence relating to such injuries on the ground the evidence would be “collateral” to the issues being tried.
Defendants acknowledged that Cataldo was entitled to drop these claims. They nonetheless argued that the prejudice to the defense was so severe they were entitled to a continuance. Defense counsel argued that those claims were intertwined with Cataldo’s remaining claims, his trial preparation had assumed their inclusion, his cross-examination was based on the allegedly false histories Cataldo gave to her health care providers, and all of her medical records contained references to the newly dropped claims. He contended that it would be impossible for him to proceed to trial in view of the “dramatic change” made in the case. The court denied the motion for a continuance. Later at trial, motions for mistrial were made on the same basis and were also denied. The argument was also raised in Health First’s motion for new trial, wherein defense counsel argued that Cataldo’s primary claim of injury in the three years leading up to trial was a “brain injury” and that a whiplash injury was only “coincidentally” appended to this claim. Along with its ruling that Cataldo could withdraw the traumatic brain injury and dental injury pleaded in the complaint, the court ruled that Defendants would not be permitted to impeach Cataldo with evidence regarding those prior claims.
The case was tried before a jury over a period of two weeks. Cataldo sought compensation for injuries to her cervical spine, thoracic spine, and right elbow. She also claimed she suffered from severe depression as a result of the accident. In support of her claim for cervical spine, i.e., neck, injuries, Cataldo offered the testimony of three treating physicians — her neurosurgeon, a neurologist, and an orthopedic surgeon. Her witnesses testified that she had severely herniated or ruptured three discs in her back in the accident, requiring her to undergo surgery to fuse three vertebrae together. Her injuries resulted in what her neurosurgeon quantified as an impairment of eleven percent of her whole body even after treatment. Her physicians admitted that Cataldo’s spine showed minor degenerative changes prior to the accident, but denied that her post-accident problems were related to any degenerative changes. They explained that this was a “very dramatic case” and that it would have been virtually impossible for her to walk around with these injuries prior to the accident. They also testified that a low-speed crash could, in fact, cause the type of injuries suffered by Cataldo. Additional testimony indicated that the discs above and below where the vertebrae were fused showed signs of degeneration due to additional wear and tear placed on them by the fusion. This complication, the physicians opined, occurs in about thirty percent of spinal fusions, and was occurring more quickly in Cataldo than most patients. As a result, Cataldo will require additional surgery. She also suffered a *863 herniated disc in her thoracic spine that cannot be treated by surgery.
There was also testimony that Cataldo has become severely depressed because of her injuries and that her depression is permanent. Her psychologist has been seeing her every two or three weeks since October 2006 for depression and has tested her on several occasions since the accident. He saw no signs of deception and testified that her depression has worsened significantly since she was first tested in 2005. She is now severely depressed and has chronic pain syndrome. She also has anxiety associated with the depression. The psychologist believed that the problems were caused by the motor vehicle accident in September 2005. He further explained she is no longer able to work and is in need of ongoing therapy to aid in accepting her limitations.
A life care plan was prepared for Catal-do, with the aid of the specialists who had treated her. The life plan predicted precisely what kind of medical and other care she will need as a result of the accident, and included projected costs. An expert testified that Cataldo’s limitations made her incapable of working. She was earning $46,804 a year when the accident occurred.
Frederick Raffa, Ph.D., expanded on the life plan. He testified that Cataldo was 42.6 years of age when the accident occurred and has a life expectancy of 82.61 years. Her past lost wages are $212,372, while her future lost wages reduced to their present value are $944,802. The present value of her future medical care is $962,145 or $963,186, depending on which of two treatment options she chooses.
Defendants essentially conceded the claim for injuries to Cataldo’s elbow, which had been surgically treated and presented few recurring problems as of trial. They contested the remaining claims, contending that the accident was a low-impact incident that caused nothing more than a soft-tissue cervical strain. They insisted that Ca-taldo was exaggerating her injuries, some of which preexisted the accident, and that Cataldo had misrepresented various aspects of the accident and her prior medical care. They called a series of witnesses to support this contention. Among them was Peter Livingston, M.D., a diagnostic neu-roradiologist. Dr. Livingston testified that he believes Cataldo had degenerative disc disease that predated the accident. He acknowledged that he has worked with defense counsel on four other cases and that he works on eight to ten cases a year for members of defense counsel’s firm. On cross-examination, he testified that he has no opinion regarding the cause of Ca-taldo’s problems, nor any opinion regarding her need for surgery. He was also unable to offer any opinion on whether Cataldo suffered any permanent injury as a result of the crash. The defense also called a private investigator hired to conduct surveillance on Cataldo. Condensed footage of his surveillance was played for the jury.
The closing argument made by plaintiffs counsel, John Alpizar, was fairly lengthy. Among the comments made was a suggestion that divine intervention had a hand in the selection of that particular jury. Plaintiffs counsel stated:
And you all showed up here two weeks ago on Monday, and we sat in this room •with 50 people, and some of you stayed and some of you didn’t stay. And your name was called, and you were randomly selected after a lot of questioning to be one of the people that are going to decide this case. And call it fate or call it whatever you want to call it, but I believe that there was a reason why you were selected.
And as I’ve watched you carefully for the last two weeks, watched you taking *864 notes, and paying attention very closely to all the evidence, and I watched you listen to this case involving a perfect stranger to you, which you know nothing about, and give it your attention, it dawned on me that whoever it is that decides what’s right and wrong in this world, had some say in you all being the one’s [sic] selected to decide this case. And so, on behalf of Miss Cataldo, I’m grateful. I thank you for being here.
(Emphasis added).
The religious theme continued with plaintiffs counsel’s argument on the subject of “repentance,” which implicitly exhorted the jury to punish Defendants:
In deciding what I was going to talk to you about and how I was going to tie it into the evidence in this case, I was reading a book. In my spare time when I am not doing this, I try to read. And I was reading about the concept of repentance. And it applies here, folks, because part of what you’re going to be doing in this case, through your verdict, is to make sure that the Defendants who caused the wrong we’re here on, really have repented for what they’ve done.
Near the end of his initial closing argument, plaintiffs counsel also argued that all the defense wanted to talk about was “damage to the bumper of the vehicle.” He suggested that Defendants were trying to “side-track” the jury and make them take their “eye off the ball” by talking “sheet metal damage” and “damage to the bumper of the vehicle.” During his rebuttal argument, plaintiffs counsel opened with the statement that the jury had just seen Defendants’ “true position,” which was that plaintiffs damages were $100,000. He argued that the defense cared nothing about “fairness and reasonableness,” and that its goal was “suggesting to you and persuading you and getting you to take your eye off the ball and to go back there and return a verdict that is not fair, that is unreasonable, because that would be a victory for them. ” (Emphasis added).
Plaintiffs counsel asked the jury to contrast plaintiffs witnesses with Dr. Livingston, who was charging the defense as much as $33,750 for his testimony. He then argued, incorrectly, that Dr. Livingston had been paid almost $1,000,000 for eases on which he had worked with defense counsel, stating:
Who has an investment in this case? This is the same Dr. Livingston, Ladies and Gentlemen, a radiologist, whose 30 cases for Mr. Reed in the last three years, well, if he earns $33,750 per case, over the last three years, this man’s been paid by Mr. Reed, one million dollars to come into courtrooms and do what he did here.
Plaintiffs counsel later reiterated, incorrectly:
[A]nd Mr. Reed’s a good lawyer and he does this a lot. Obviously, with Dr. Livingston alone, thirty cases. I don’t know how many other lawyers Dr. Livingston works with. How many other— I mean if he’s got a million dollars in three years from Mr. Reed alone for thirty cases, if he’s worked with another three or four lawyers, it’s incomprehensible to me how much he makes.
Counsel went on to question the significance of the surveillance tapes, arguing that Defendants had failed to tape Cataldo in 2005 or 2006, when she was “hurting” and “almost suicidal,” although suit was not filed until 2007. In the last few minutes of closing, plaintiffs counsel argued that the defense had given them little pieces of the story designed to “take [their] eye off the ball,” but that “justice demands, just screams out, justice cries out for you to do what’s fair and what’s right,” and to return a verdict for all of Cataldo’s damages. He argued that while *865 Defendants might not think this was a big case, it was a “huge” case for Cataldo, who had the right to life, liberty and the pursuit of happiness. Plaintiffs counsel contended that they had been forced to bring Defendants “into the courtroom kicking and screaming,” and told the jury that they needed to “take care of her through [their] verdict.” He concluded:
They are not going to take care of her. Okay? They are not going to take care of her. I think that is apparent. Health First is not going to take care of this lady’s injuries unless you tell them to do so through your verdict.
None of these arguments were objected to by Defendants.
Following rendition of the verdict, Catal-do moved for attorney’s fees pursuant to two proposals for settlement served on Defendants. A separate proposal was served on each in the amount of $1,475,000. The proposal served on Health First stated:
3. Claims the Proposal attempts to resolve: All claims for damages brought by Plaintiff, CHERYL L. CATALDO, against the Defendant, HEALTH FIRST, INC., in the action referenced herein above.
However, the proposal was conditioned on the dismissal of both the defendants, stating:
5. Non-monetary terms of Proposal, if any. If Defendant, HEALTH FIRST, INC., accepts the instant Proposal for Settlement, HEALTH FIRST, INC. and DAVID S. ORI, shall be dismissed from the instant lawsuit and the attached Release shall be executed by the Plaintiff in favor of Defendants.
A virtually identical proposal for settlement was served on Ori, which was conditioned on the dismissal of both the defendants. Health First filed a response to Cataldo’s motion for fees, arguing that the proposals were ambiguous because more than one proposal was made, making it uncertain as to whether both had to be accepted. However, the trial court entered an order finding the proposals for settlement were valid and entitled Cataldo to attorney’s fees in the amount of $440,165, plus expert witness fees in the amount of $10,250.

ANALYSIS

I. Withdrawal of Claims and Exclusion of Evidence
On appeal, Defendants argue they are entitled to a new trial because Cataldo withdrew her claim for brain and dental injuries immediately before trial. They complain that the withdrawal of these claims completely changed the theory under which the case had been pursued for three years. While they do not contest Cataldo’s right to drop the claims, they insist that the timing of the withdrawal prevented them from putting on an effective defense. They argue evidence that Cataldo had given a false history and fabricated brain and dental injuries was a significant part of their defense, and this evidence was precluded by the trial court when the claims were dropped. Defendants insist that this evidence was more than collateral impeachment evidence, and that it instead went to the heart of Catal-do’s case because her fabricated claims were used to diagnose her back injuries.
The Florida Rules of Civil Procedure expressly recognize Cataldo’s right to withdraw any claim without an order by the court, at any time both prior to and during trial. See Fla. R. Civ. P. 1.420(a). The right to dismiss claims, or portions of claims, has been termed “absolute.” Patterson v. Allstate Ins. Co., 884 So.2d 178, 180 (Fla. 2d DCA 2004). Cataldo’s counsel waited until virtually the eve of trial to alert the court and opposing counsel of a significant change in the nature of the case. The defense sought a continuance which very well might have been warrant *866 ed. However, the decision to grant or deny such a request is within the sound discretion of the trial court, and we cannot find that the denial of the request constituted an abuse of discretion. See Myers v. Siegel, 920 So.2d 1241, 1242-43 (Fla. 5th DCA 2006) (“This court considers certain factors in making that determination, including: 1) whether the movant suffers injustice from denial of the motion; 2) whether the underlying cause for the motion was unforeseen by the movant and whether the motion is based on dilatory tactics; and 3) whether prejudice and injustice will befall the opposing party if the motion is granted.”).
Having been denied their motion for a continuance, the defense asserts error in the court’s refusal to allow cross-examination of Cataldo and medical witnesses with evidence the defense contends revealed fabrication or lies related to the dropped claims. The issue raised is one of relevancy. As to Cataldo, the defense suggests the admission of such evidence is relevant to attack her credibility. This Court reviews the trial court’s decision regarding the admission or exclusion of evidence for an abuse of discretion. See Philippon v. Shreffler, 33 So.3d 704, 707 (Fla. 4th DCA 2010); Triplett v. State, 947 So.2d 702, 704 (Fla. 5th DCA 2007).
Once the claim for damages was dropped, evidence that Cataldo allegedly misrepresented her head and dental injuries generally is inadmissible because it constitutes impeachment on a collateral issue. See, e.g., Nationwide Mut. Fire Ins. Co. v. Bruscarino, 982 So.2d 753 (Fla. 4th DCA 2008) (holding, where insured dropped claim against insurer for lost wages on first day of trial, it was error to permit insurer to impeach insured with evidence of discrepancy between her deposition testimony that she earned $900 weekly as waitress and tax returns reflecting earnings of $200 weekly); Doremus v. Fla. Energy Sys. of S. Fla., Inc., 634 So.2d 1106 (Fla. 4th DCA 1994) (determining court should not have allowed defendant to impeach plaintiff about false statement on employment application regarding discharge from military because plaintiff falsely claimed on application he had no back issues); New England Oyster House of N. Miami, Inc. v. Yuhas, 294 So.2d 99 (Fla. 3d DCA 1974) (holding, in action for injuries sustained by plaintiff when she tripped and fell on concrete curb and where plaintiff dropped claim for lost wages, trial court properly refused to permit defendants to impeach plaintiffs credibility with statement in her deposition that she lied on her income tax returns); see also Foster v. State, 869 So.2d 743, 745 (Fla. 2d DCA 2004) (“The test for determining whether a matter is collateral or irrelevant is whether the proposed testimony can be admitted for any purpose independent of the contradictions.”) (quotations omitted). While there might be circumstances under which the evidence in this case might be relevant and thus admissible, none were established and the trial court did not abuse its discretion in prohibiting impeachment of the withdrawn claims.
Allowing impeachment on this matter opens the door to collateral issues such as a discussion of the trial strategy employed. Evidence that she dropped these claims was not proof that the claims were untrue or that Cataldo was exaggerating the severity of her injuries. Accordingly, because the evidence that Defendants sought to introduce had no tendency to prove what it was offered for — that Catal-do had exaggerated or fabricated her claims — the trial court did not abuse its discretion in excluding the evidence.[3]
*867 Defendants also argue that the excluded evidence went to the heart of Cataldo’s case because her “fabricated” claims were used to diagnose her back injuries. No proffer was made, however, showing that the information complained about had any effect on the diagnosis made by any physician. Instead, all that was shown was that the information was disclosed to certain physicians.
Defendants have largely failed to identify any specific evidence that was wrongfully excluded due to the trial court’s ruling, making it impossible to evaluate these claims. Defendants did not, for the most part, make a proffer of this evidence which is necessary to preserve for review the allegedly wrongful exclusion of evidence.[4] Doctors Co. v. State, Dep’t of Ins., 940 So.2d 466, 471 (Fla. 1st DCA 2006) (recognizing offer of proof must be made in order to preserve issue of excluded evidence).
II. Improper Closing Argument
Defendants contend they are entitled to a new trial because of improper closing arguments made by Cataldo’s counsel. The arguments in question allegedly: (1) disparaged the defense that this was a “low impact” case; (2) invited the jury to punish Health First for not taking care of Cataldo and paying for her injuries; (3) attacked Dr. Livingston, who was Health First’s only medical expert, in a factually inaccurate manner, for testimony he gave regarding other clients of defense counsel’s firm; and (4) suggested that jurors had been chosen by God to provide for Cataldo. While Defendants concede that their attorney failed to object, they contend the cumulative effect constituted fundamental error warranting a new trial under the test set forth in Murphy v. International Robotic Systems, Inc., 766 So.2d 1010 (Fla.2000).
Murphy details four requirements for granting a new trial in a civil case based on allegedly improper, but unobject-ed-to, closing argument. First, a complainant must establish that the argument being challenged is, in fact, improper. Id. at 1028. Second, the argument must be harmful, i.e., “so highly prejudicial and of such collective impact as to gravely impair a fair consideration and determination of the case by the jury.” Id. at 1029. Third, the improper argument must be incurable, meaning that a curative instruction could not have eliminated the probability that the argument resulted in an improper verdict. Id. at 1030. Finally, the complaining party must show that “the argument so damaged the fairness of the trial that the public’s interest in our system of justice requires a new trial.” Id.; see also City of Orlando v. Pineiro, 66 So.3d 1064, 1068 (Fla. 5th DCA 2011) (stating unobjected-to, improper argument must be “of such a nature as to reach into the validity of the trial itself to the extent that the verdict could not have been obtained but for such comments.”) (quotation omitted). These issues must be presented to the trial court by means of a motion for new trial before *868 the issue can be considered on appeal. Murphy, 766 So.2d at 1027. This Court reviews the trial court’s ruling under an abuse of discretion standard, because the trial judge is in the best position to determine the impact of improper argument on the jury. Id. at 1030-31..
Commendably, at oral argument Catal-do’s counsel conceded the impropriety of Mr. Alpizar’s closing argument. As set out, the record is replete with improper arguments. The religious references and appeal to a higher power improperly suggested to the jury that God favored a verdict in favor of Cataldo. These references were coupled with a request that the jury “punish” Defendants, who had not “repented” for their sins. Repeated statements that Defendants were trying to sidetrack the jury and make them take their eye off the ball improperly disparaged the defense and implied that Defendants had done something improper by defending the case, as did statements suggesting that Defendants had to be dragged “kicking and screaming” into the courtroom, that the jury had to force Defendants to take care of Cataldo, and that it would be a victory for the defense if they got an “unfair” verdict. Finally, counsel grossly misstated the compensation that had been paid to Defendants’ only medical witness. He argued, incorrectly, that Dr. Livingston had been paid almost $1,000,000 over three years for cases on which he had worked with defense counsel, and implied that no one knew how much the doctor received from defense counsel’s firm after considering he had worked with three or four other lawyers at the firm.[5]
 Closing argument is designed “to help the jury understand the issues in a case by ‘applying the evidence to the law applicable to the case.’ ” Murphy, 766 So.2d at 1028 (quoting Hill v. State, 515 So.2d 176, 178 (Fla.1987)). While attorneys should be afforded great latitude in presenting closing argument, “they must ‘confíne their argument to the facts and evidence presented to the jury and all logical deductions from the facts and evidence.’ ” Murphy, 766 So.2d at 1028 (quoting Knoizen v. Bruegger, 713 So.2d 1071, 1072 (Fla. 5th DCA 1998)). Similar arguments have been repeatedly disapproved for their inflammatory and prejudicial content. See Pineiro, 66 So.3d at 1069-71 (finding it improper to argue defendants would be laughing if no verdict was returned in favor of plaintiff and that a damage award would tell parents what happened was wrong, and stating inflammatory and prejudicial comments will not be permitted); Fasani v. Kowalski, 43 So.3d 805, 809-10 (Fla. 3d DCA 2010) (disapproving argument that defendant kicked plaintiff out on street like a “dog,” had refused to “do the right thing,” and refused to pay due to “greed and arrogance,” and opining “[t]he law is clear that it is improper for an attorney to disparage an opposing party’s defense of a case or to suggest that a party should be punished for contesting a claim.”); Chin v. Caiaffa, 42 So.3d 300, 309 (Fla. 3d DCA 2010) (holding improper plaintiffs efforts to paint entire defense as “frivolous” and designed to “add [] insult to injury,” to accuse defense counsel of “try[ing] to fool you,” to argue a defendant is not contrite *869 and has not apologized for an accident, and to argue that defendant made bigger mistake of trying to avoid responsibility by calling witnesses who did not tell the truth in an effort to do anything to win or save the day); SDG Dadeland Assocs., Inc. v. Anthony, 979 So.2d 997, 1002 (Fla. 3d DCA 2008) (finding it improper to refer to defense as “frivolous”); State Farm Mut. Auto. Ins. Co. v. Revuelta, 901 So.2d 877, 379-80 (Fla. 3d DCA 2005) (disapproving argument that implied failure to pay was improper).
While conceding that many of her counsel’s arguments were improper, Cataldo notes that Murphy provides “an escape valve with a very narrowly defined parameter and of extremely limited application. ...” 766 So.2d at 1026; accord Mercury Ins. Co. of Fla. v. Moreta, 957 So.2d 1242, 1250 (Fla. 2d DCA 2007). She insists that an improper argument does not necessarily satisfy the Murphy standards so as to entitle Defendants to a new trial. Noting that she was awarded less than half of the damages she sought, Cataldo argues the result demonstrates that any improper argument did not so damage the fairness of the proceedings as to require a new trial. We reject that logic. It is equally arguable that the verdict exceeded Cataldo’s pre-trial evaluation of the value of her case, neither of which is helpful to our analysis.
We strongly disapprove of the tactics used during Cataldo’s closing argument. We find, however, that the trial court did not abuse its discretion by refusing to order a new trial. We cannot say under Murphy’s fourth prong that the arguments “so damaged the fairness” of the trial as to require a new trial. 766 So.2d at 1030.
III. Offers of Judgment
Defendants argue that the trial court erred by awarding attorney’s fees to Cataldo based on two proposals for settlement made to them on September 2, 2008. Defendants did not respond to either offer of judgment, which were therefore deemed to be rejected. Fla. R. Civ. P. 1.442(f)(1). Defendants argue that the fee award must be reversed because the offers of judgment made in this case by Cataldo were too ambiguous to support a fee award. Because more than one offer was made and each offered to resolve Cataldo’s claims against more than just the offeree, they assert it was impossible to tell whether each defendant had to pay $1,475,000, the amount stated in the offer, or whether a single payment of $1,475,000 would resolve both claims. They contend that these “ambiguities” preclude a fee award pursuant to section 768.79, Florida Statutes, and Florida Rule of Civil Procedure 1.442.
Cataldo argues that courts must use reason and common sense when viewing a proposal for settlement. She contends that the offers made in this case met the requirement that they be “sufficiently clear and definite to allow the offeree to make an informed decision without needing clarification.” State Farm Mut. Auto. Ins. Co. v. Nichols, 932 So.2d 1067, 1079 (Fla.2006). She claims that the offers made clear that the payment of $1,475,000 by a single defendant would obtain the release of all defendants, and insists that her promise to release multiple defendants does not transform the offer into an impermissible joint offer.
This Court reviews de novo a trial court’s ruling on a motion to award attorney’s fees and costs pursuant to the offer of judgment statute and rule. Sparklin v. S. Indus. Assocs., 960 So.2d 895, 897 (Fla. 5th DCA 2007). The rule requires that settlement proposals “identify the claim or claims the proposal is attempting to resolve” and “state with particularity any relevant conditions.” Fla. R. *870 Civ. P. 1.442(c)(2)(B), (C). An offer must also “state with particularity all nonmone-tary terms.” Fla. R. Civ. P. 1.442(c)(2)(D). While it is impossible to eliminate all ambiguity in an offer, the rule “requires that the settlement proposal be sufficiently clear and definite to allow the offeree to make an informed decision without needing clarification.” Nichols, 932 So.2d at 1079. Offers containing a latent or patent ambiguity that could reasonably affect the offeror’s decision are too indefinite to allow a fee award. Nationwide Mut. Fire Ins. Co. v. Pollinger, 42 So.3d 890, 891-92 (Fla. 4th DCA 2010).
Neither of the offers made in this case appears too indefinite or ambiguous to support a fee award, nor do the offers constitute impermissible joint offers. See Andrews v. Frey, 66 So.3d 376 (Fla. 5th DCA 2011). The offer of judgment in Andrews has many similarities to the case at bar. In Andrews, the plaintiff and her minor daughter filed suit against the defendants, Shannon Frey and her father, for injuries suffered in an automobile accident. The damages sought from Mr. Frey were based on a theory of vicarious liability under the dangerous instrumentality doctrine. Prior to trial, Shannon Frey served separate proposals for settlement on both plaintiffs. She offered $50,000 to the mother and $10,000 to the minor daughter. Each proposal for settlement identified Shannon Frey as the offeror and required the execution of a “full Release releasing Defendants, SHANNON D. FREY and RUDOLPH E. FREY, and their insurers, with regard to any and all claims that arose as a result of the subject incident set forth in Plaintiffs Complaint. ...” Id. at 377-78. The Freys were ultimately awarded fees due to the rejection of their offer of judgment. On appeal, the Andrews argued that Shannon Frey’s offer of judgment could not support a fee award because it was unclear whether it was a joint proposal, and it required them to release Mr. Frey and the insurance company. This Court found the release insufficient to invalidate the offer, explaining that “[t]he proposals for settlement clearly and unequivocally stated that Shannon Frey was the sole offeror. The fact that the proposals conditioned acceptance on releasing Rudolph Frey neither created an ambiguity, nor transformed them into joint offers.” Id. at 378.
This Court further noted in Andrews that the offers made to each plaintiff were not improperly conditioned on acceptance by the other plaintiff, which would have precluded each from independently settling his or her claim. Id. at 379. Mr. Frey’s liability was based on vicarious liability and was therefore coextensive with that imposed on his daughter, who was the active tortfeasor that made the offer. Upon affirming the lower court, this Court certified the following question to the Florida Supreme Court:
WHETHER THE TERM “JOINT PROPOSAL” IN RULE 1.442(C)(3) APPLIES TO CASES WHERE ACCEPTANCE OF THE OFFER IS CONDITIONED UPON DISMISSAL WITH PREJUDICE OF AN OFFEREE’S CLAIMS AGAINST AN OFFEROR AND A THIRD PARTY?
Id. at 380.[6]
Here, each offer was made by the single plaintiff (Cataldo) to a single defendant, one of whom (Health First) was vicariously liable for the remaining defendant (Ori). *871 There was no denial of vicarious liability so that the interests of the defendants were coextensive. Each offer was for a definite amount and was not the equivalent of a joint offer, even though the plaintiff promised to release all the defendants if the offer was accepted. As for the requirement that a release be executed, the Florida Supreme Court has expressly recognized the right to include nonmonetary conditions (such as a release) in an offer of judgment, as long as such conditions are described with particularity in the offer. Nichols, 932 So.2d at 1078 (holding that a general release is a relevant condition or nonmonetary term that must be described with particularity in the offer). Finally, the offer was not too indefinite or ambiguous for enforcement simply because an offer was made to each defendant, which is similar to what occurred in Andrews. Based on the foregoing, the offers of judgments made by Cataldo were valid and enforceable and were not ambiguous. Nor were the offers invalidated because of Ca-taldo’s promise to release the remaining defendants as a nonmonetary term of the settlement. This covenant does not transform the offer into an undifferentiated joint offer.
We find no error as to the remaining evidentiary issues raised on appeal.
AFFIRMED.
LAWSON and JACOBUS, JJ., concur.

. The van weighed approximately 6,000 pounds and sat twelve feet high, about twice the size of a normal pickup truck.

. The lies apparently did not rise to the level of warranting the filing of a motion to dismiss.

. Some evidence regarding these claims did, in fact, go to the jury. For example, Dr. Charles Theofilos examined a number of med *867 ical records with respect to Cataldo’s care and treatment, including Cataldo’s neurologist’s notes. He also reviewed medical records, such as MRIs and CAT scans, examined the patient, and took her history. On cross-examination, Dr. Theofilos was asked to read the complete history he had obtained from Cataldo. It included complaints of “subocci-pital headaches which are constant with radiation into her inter scapular region,” "memory loss,” and "some dizziness.” It also stated that she "had been seen by a doctor ... Ziegler, who follows her for memory loss and is awaiting the results of her last examination.”

. Defendants did make a proffer at trial of a few pages of Cataldo’s medical records, in which she referred to alleged brain and dental injuries.

. The one million dollar figure was more likely the amount that Dr. Livingston received while working for the entire firm. On proffer by plaintiff's counsel, the doctor admitted that at his deposition he had testified that he had worked for defense counsel's firm a number of times in the past. He estimated at the deposition that he worked for the firm on eight to ten cases a year, and had worked for Mr. Reed, lead counsel, two to three times before. He did not dispute that he may have worked for the firm at least thirty times in the past three years, but said he did not keep records.

. The question was the same as that certified by the Eleventh Circuit Court of Appeals in Auto-Owners Insurance Co. v. Southeast Floating Docks, Inc., 632 F.3d 1195 (11th Cir.2011).